Woodward *et al. vs.* Seely *et al.*

---

LUTHER WOODWARD and GEORGE COWELL, appellants, *vs.* WILLIAM SEELY and CHARLES C. ELLIOT, appellees.

*Appeal from Woodford.*

A bill of peace, where the parties are not numerous, will not be sustained to prevent multiplicity of actions at law, before the rights of the parties have been settled in a Court of law.

A party cannot come into a Court of Equity to enforce his rights, when he has a full and complete remedy at law.

A mere license, whether by deed or parol, is always revocable at the will of the licensor, unless coupled with an interest and executed, then it is irrevocable.

A license coupled with an interest in land, must be in writing.

A license perpetually to overflow the land of a party granting such license, would create an interest in the land, and, therefore, the license cannot be granted by parol.

A Court of Equity will not enforce a parol license to overflow the lands of the licensor, even in favor of a party who, instead of procuring a license by deed, has acted in good faith upon the parol license, and made valuable improvements upon his own land, which will become worthless if the license is revoked.

This is a bill in chancery, alleging that some time in the spring of the year 1835, Luther Woodward, one of the complainants, in company with one Levi Woodward, came to La Salle county, and became acquainted with William Seely, one of the respondents. That Seely told Luther Woodward, that he, Seely, owned an hydraulic privilege on the Big Vermilion river, where he had erected a saw mill; said Seely also told Woodward, that there was another water privilege on the said stream, immediately below the one occupied by him, and recommended Woodward very urgently to purchase and improve the same, by the erection of a saw mill, or in some other way. That Woodward, listening to the advice and persuasion of Seely, went with him to examine the said water privilege, when said Seely pointed out the lowest west line of his, said Seely's land, on which he had erected his said saw mill, and pointed out and explained the nature and extent of the said water privilege, below the land of said Seely, and again urged and persuaded Woodward to purchase and improve said privilege, stating that it would be a great benefit to, and enhance the value of the land in the neighborhood. That Woodward, upon a careful examination of the

premises, informed Seely, that he, Woodward, could not safely build a dam on the said water privilege, only at the place where Seely's dam stood, by reason of the loose state of the bottom of the river; and in order to erect his dam with perfect safety, it would be likely to flow the water back above the west line of said Seely's land, as there was little or no fall on the said lower water privilege, from the west line of said Seely's land, to the place where said Woodward's dam stood, at the time of the filing of the bill. Thereupon Seely told Woodward that there was a considerable fall on said Seely's land, between his said lower or west line, and his saw mill, and that if Woodward would purchase and improve the lower privilege so pointed out and recommended by Seely to Woodward, that Woodward might have and enjoy the right to flow back the water, provided he did not raise his dam so as to cause the water to flow up stream, so as to interrupt and hinder Seely in the use of his mill. Which offer and inducement Seely repeatedly made and urged upon Woodward, until, in consideration thereof, Woodward was induced and persuaded to purchase the lower water privilege, or the lands so recommended by Seely to Woodward, viz: the west half of the south-east quarter, and the east half of the south-west quarter of section eight, township thirty-two north, of range two, east of the third principal meridian; and thereupon proceeded to improve the same, as is set forth in the bill. That in the month of May, 1835, Woodward purchased the fee simple and title of Edward Fay, who was then the proprietor of the west half of the south-east quarter of said section eight, and took a release of said Fay's claim to the said east half of the south-west quarter of said section eight, and paid the said Fay therefor the sum of two hundred and five dollars. That Woodward, subsequently, about the month of July, 1835, purchased with and in the name of said Levi Woodward, of the government of the United States, the said last mentioned eighty acre lot, and paid therefor one hundred dollars. That complainant, Woodward, immediately after the purchase from Fay, and about the last of May, 1835, went to the state of Massachusetts, and commenced purchasing irons and other necessary materials for the purpose of erecting a saw mill on the premises, and improving the water privilege, in accordance with the permission of and understanding with said Seely, as above set forth; and in

the autumn of the same year, Woodward employed two men and sent them to the said premises, with the said materials, at an expense of several hundred dollars; that these men, on arriving at the premises, commenced getting out timber and other materials, for the purpose of improving said mill privilege, in accordance with the permission granted by Seely. That Woodward returned to the premises with his family, and, in person, went on with the improvements already commenced. That in the spring of 1837 he commenced constructing his dam, and digging a race, to convey water to his mill, finished his dam, partly finished his mill-race, and mill. That all were completed and ready for operation some time in July following, at an expense of $5,000. That the dam is about five hundred feet long and three feet high, which is situated near half a mile above the mill, and about thirty rods below the west line of Seely's land. That although the dam of Woodward and Cowell raises a head of water of about three feet, on the land of said Seely, to wit, in the bed of the river, yet it does not flow the water back, so as to interrupt him in the use and enjoyment of his said saw mill. That some time in the summer of 1835, Levi Woodward released and conveyed to Luther Woodward, complainant, whatever interest said Levi had in the premises, and about the same time, complainant, Woodward, sold to James S. Bullock, Joseph Bullock and Maxey O. Bullock, one undivided fourth part of the said premises, and in July, 1839, all of said Bullocks, for a valuable consideration, reconveyed to complainant, Woodward, all their interest in said premises. That some time in the spring or summer of 1837, Woodward conveyed to Cowell, his co-complainant in this bill, an undivided eighth part of said premises, and also to one Floyd C. Knapp, for a good consideration, another undivided eighth of the premises, which was reconveyed afterwards by Knapp to Woodward. That when Woodward returned to La Salle county, in the fall of 1836, he found one Charles C. Elliot, one of the defendants, in joint possession with Seely, of Seely's premises, and that he conversed and advised frequently with Elliot, as to the construction of said dam, and explained his intentions in relation thereto. That some time in the fall of the same year, and while Elliot was in the immediate neighborhood, Woodward built a wall of stone, about eight feet long and three feet wide, and to the full height to which the com-

plainants' dam stood, and where it is now erected, and gave out and promulgated in the neighborhood, and also to Seely and Elliot, that the said wall was to show the location and height of Woodward's then intended dam. That when Elliot became interested with Seely in the premises of Seely, he was fully advised and well aware of the existence, nature and extent of the license given by Seely to Woodward, and that he, Elliot, took his interest, subject to the license, and that Woodward and Elliot conversed frequently about the license, whereby Elliot was informed by Woodward of the existence, nature and extent of said license, and that Woodward was about building said dam in pursuance of said license, and that said dam, when erected, would flow the water back on to the land so occupied by Seely and Elliot, as high as the same might be done without injury to, or impeding of the operation of the mill of Seely and Elliot. That Elliot saw the works of Woodward daily as they progressed, from 1836 until about August, 1837, without intimating in any way, that he objected to the execution of the license, although it was notorious that Seely had given Woodward permission to flow the water up the stream as hereinbefore stated, and that without such permission, the dam would be entirely useless. That since the completion of the dam and mill, &c., on or about the 19th December, 1840, Elliot commenced an action at law in trespass against complainants, and the Bullocks and Knapp, complaining of the construction of said dam, whereby the water is made to flow back up said stream, and on the lands of Elliot, and thereby ͦwned out the water privilege of Elliot. That on the 26th December, 1840, and on several days subsequent thereto, the said Seely and Elliot commenced divers actions of trespass against complainants for the same cause. That Seely and Elliot refused to dismiss these several suits, but threatened, not only to prosecute them to judgment, but also to bring others, so long as Woodward and Cowell should continue to keep up their mill-dam.

The bill prayed for an answer to the bill, an injunction against proceedings at law, and for general relief. An injunction was allowed.

Seely answered separately, denying generally the allegations of the bill; admitted having had some conversations with the Woodwards about mill privileges on the Vermilion river, but

denies having given permission to erect a dam, &c., as charged in the bill. Alleges that water flows back to the injury of his mill. Admits he brought the suits, and insists that he has the right so to do. Cowell makes much the same answer to the bill.

Proofs were taken upon the bill and answer, but as the opinion of the Court does not depend upon the proofs, it is unnecessary to furnish an abstract of them.

A change of venue was had in the suit, and it came on to be heard upon bill, answers, replications, depositions and exhibits, before Treat, Judge, at Woodford county, at the April term, 1847, of the Circuit Court, when a decree was pronounced, dissolving the injunction and dismissing the bill. An appeal was prayed by the complainant, Woodward, and allowed.

S. T. LOGAN, for appellant.

O. PETERS, for appellees, presented and supported his argument as follows :

A Court of Chancery has no jurisdiction of this case, the complainants having a complete remedy at law. If the license set up in the bill is a good license, it may be pleaded, and is a complete bar of the suits at law. 1 Chitty's Pl., 528, 544. A trial at law of this issue, would determine the rights of the parties. Plumleigh *vs.* Dawson, 1 Gilman R., 544. Where the remedy is thus complete, Courts of Equity will not interfere. Jerome *vs.* Ross, 7 John. Ch. Rep., 331 and 337. By the bill it appears that the complainants have not established any right at law ; and until this is done, a Court of Equity will not interfere ; unless, perhaps, where parties are so numerous that a full remedy cannot be had at law. Fonblanque's Equity, 28 ; Eldredge *vs.* Hill, 2 John. Ch., 281, also, 375 to 379 ; Livingston *vs.* Livingston, 6 John. Ch. Rep., 499 ; 2 Story's Equity, p. 174, *et. seq.*

The proof does not show such license as is claimed by the bill. Title cannot be proved by rumor or reputation. Nor is rumor sufficient to charge a purchaser with notice. 2d Sug. on Vend., 315 to 320 ; 1 Story's Equity, sec. 400 ; Jolland *vs.* Stainbridge, 3 Ves., 478. At common law, one cannot flow water back upon the land of another. Angel on Water-courses, 94 ; 9 Mass. R., 306 and 316 ; 2 Gil. R., 298 ; Plumleigh *vs.* Dawson, 1 Gil. R., 550 ;

21

23 Eng. C. L. R., 76 ; 27 vol. of same work, 11, as to priority. The license being by parol, as shown by bill and proofs, was not a good license, and was void, or at least voidable by the statute of frauds.

The bill terms this a license; it is more properly an *easement*, for it is claimed as a permanent interest in, or right to encumber the defendants' land. Rev'd Stat., p. 258, sec. 1 ; 1 Chitty's G. Prac., 292, 337, 338, 339, 340, 635; Cook *vs.* Stearns, 11 Mass. R., 533 ; Mumford *vs.* Whitney, 15 Wend. R., 390 ; Right to flow must be secured by deed. Miller *vs.* Auburn and Syracuse R. R. Co., 6 Hill's Rep., 61 ; 3 Kent's Com., 451, 452 and 453, and also notes to the title " Rights by License ;" 1 Sug. on Vend., pa. 91 to 98, and note ; Heaton *vs.* Ferris, 1 John., Rep., 145 ; Phillips *vs.* Thompson, 1 John. Ch. Rep., 131 ; 11 Metcalf's Rep., 251, Stevens *vs.* Stevens.

If there was a license, it was revoked before the commencement of the suits at law. Woodward was forbidden to proceed with his dam, and this was a good revocation. *Ex parte* Coburn, 1 Cowen, 568 ; Fentiman *vs.* Smith, 4 East Rep., 107 ; Hawkins *vs.* Shippam, 11 Eng. Com. Law R., 207; Tillotson *vs.* Preston, 7 John. R., 288 ; Cook *vs.* Stearns and Mumford *vs.* Smith, before cited.

A license is personal and is not assignable. Emerson *vs.* Fish *et al.*, 6 Greenleaf's Reps., 205. The bill alleges that license was given to Luther Woodward ; the proof is, that it was to others as well as to him; at least, others entered into the enjoyment of the supposed permission or license. This was, of itself, a revocation or rejection of the license, or an assignment of a part of it ; and either would destroy it. So, too, a sale by Seely to Elliot was a revocation of the license ; clearly so if he purchased without notice, as it is shown he did.

If there was such a license as is claimed by the bill, Woodward exceeded it, and flowed higher than he pretended he was authorized to do. He makes no claim of any right to flow, so as to interfere with the saw mill of defendants.

Opinion by Mr. Justice TRUMBULL :*

This bill was filed to restrain the defendants from prosecuting certain actions which they had commenced, and perpetually to

---

*Mr. Justice CATON having been of counsel, did not sit at the hearing of this cause.

enjoin them from instituting others, to recover damages for the overflow of their lands; the complainants alleging that said overflow was by the license and, permission of the defendants, and occasioned by the erection of a mill-dam upon their own land, which they had been at great expense in constructing. None of the actions at law had been disposed of, when the bill was filed, though several were then pending, and the defendants were continuing to commence them at intervals of every few days.

Can this bill be maintained? We think not. There is no instance in which a bill of peace, where the parties were not numerous, has been sustained, to prevent multiplicity of actions at law, before the rights of the parties have been settled in a Court of law. The principle that a party cannot come into equity to enforce his rights, when he has a full and complete remedy at law, is too familiar to require the citing of authorities to support it. The license in this case, if valid and effectual, constitutes a complete defence at law; and until that defence has been established, and the defendants continue afterwards to harrass the complainants by vexatious suits, chancery has no jurisdiction in the matter. Eldridge *vs.* Hill, 2 John. Ch., 281; West *vs.* Mayor, &c., New York, 10 Paige, 539. But admitting that chancery has jurisdiction, and that the complainants have established by proof, the granting of a *parol license* to overflow the land of the defendants, as they insist—the evidence of which is by no means satisfactory—are they entitled to the relief sought? We are aware that there is some conflict in the authorities, as to the effect of a parol license to enter upon the lands of another; that a distinction has been drawn between an easement or privilege in land, and a license or authority to do something upon land, and that different Courts have arrived at opposite conclusions, as to the necessity of a writing, to take cases out of the statute of frauds, while professing to found their decisions upon the same authorities. In this state the question is new, and we feel at liberty, in the conflict of authorities, to settle it upon principle, and what we believe to be the true interpretation of the statute, without attempting to examine and explain the numerous cases upon the subject of parol licenses, which have been so often reviewed and commented upon by the various Courts, both of this country and England.

What then is a license? Simply the permission to do something which, without such permission, would have been unlawful. It matters not whether granted by deed or by parol; as a mere license, it is always revocable at the will of the licensor, but when coupled with an interest, and executed, it is irrevocable, and this constitutes the distinction between revocable and irrevocable licenses. In the books, this is illustrated by the case where a man authorized another to hunt in his park, and carry away the deer which he should kill. Here is a license to hunt, coupled with a grant or right to carry off the deer, and is, therefore, irrevocable when acted upon, and the deer killed, until they are carried away, if in a reasonable time; but a mere license to hunt in one's grounds, whether by deed or by parol, is revocable at any moment. When the license is coupled with an interest in land, or of such a character that the interest could not pass by parol, then a writing is essential to the creation of the interest, otherwise no interest passes. In this case, the license, while unrevoked, authorized the complainants so to erect their dam as to overflow the land of defendants, and released them from the damages, to which they would otherwise have made themselves liable in so doing, but did it give them the right to overflow the lands of the defendants, and deprive them of their use perpetually and forever? If so, the license certainly carried with it an interest in the land, and if the grant of the interest was valid, the license became irrevocable. But can such an interest be granted by parol? To hold that it could, would, to use the language in 1 Sugden on Vendors, 80, be "in the very teeth of the statute," which declares that every contract for the sale of lands, tenements or hereditaments, or any interest in or concerning them, for a longer term than one year, shall be in writing. If one man can acquire by parol, the right so to use another's land as to render it useless to the owner, it will be but taking a short and easy step, and going very little further, to hold that he may acquire the title itself, by parol; for of what avail is it to a man to have the naked title to a piece of land, which he cannot use, but which, in spite of him, another has the right to keep forever covered with water?

A right of way, it is said, cannot be granted by parol, but must be founded upon a deed, or writing, or presumption which presupposes one, and it is difficult to conceive how the right to pass

over the land of another should constitute an interest in it, incapable of being granted by parol, while the right to cover it with water constitutes no such interest. In our judgment, a license perpetually to overflow the land of the defendants would create an interest in it, and, therefore, could not be granted by parol; consequently, the license in this case carried with it no interest, and was revocable at the will of the party granting it. The defendants have chosen to revoke it, and thereupon the complainants became liable for any subsequent overflow of the land. It makes no difference that the complainants may have acted upon the parol license, and erected valuable buildings, which will become worthless in case the license is revoked: before acting so imprudently, they should have acquired permission by deed to overflow the land of the defendants. Nor can the complainants call upon a Court of Equity to enforce the license, upon the ground that they have made valuable improvements, and expended their money, relying in good faith upon it. It is not like the case of a parol purchase of land, where the purchaser contracts to pay the value of the land, enters into possession, and makes valuable improvements, when a Court of Equity will compel the vendor, who has received the purchase money, to make a title to the land; and Courts have some times regretted that the statute should so far have been departed from, as to allow parol contracts for the sale of lands, even under such circumstances, to be enforced. To enforce the license in this case, where nothing was ever paid or agreed to be paid the defendants, for the privilege of flowing their land, and where no improvements have been made upon, or possession taken of it, except by covering it with water, would be a still farther departure from the statute, by extending a doctrine, originally of doubtful propriety, and which, if it were a new question, would now perhaps be settled otherwise. A reference to a few modern decisions, analagous in principle, is all that is deemed necessary in support of the views we have expressed. The case of Wood *vs.* Leadbetter, decided in the Court of Exchequer in 1845, and reported in 13 Meeson & Welsby's Rep., 837, is the most recent English decision upon this subject that has come to our notice. In that case, the plaintiff had purchased a ticket of the proprietor of the Doncaster race course, for which he paid a guinea, and which was understood to entitle him to come into the stand

and enclosure surrounding it, and remain there every day during the races. While in the enclosure, he was requested by the defendant to leave, and upon his refusing to comply, the defendant, by the direction of the proprietor of the race course, turned him out, and for so doing the plaintiff brought suit. The Court, after reviewing most of the cases upon the subject of parol licenses which had been decided in England, came to the conclusion, that a right to come and remain for a certain time upon the land of another, could be granted only by deed; and that a parol license to do so, though money be paid for it, is revocable at any time, and without paying back the money. Consequently, it was held that the plaintiff could not recover, though he had in nowise misbehaved, and that his having paid a valuable consideration for going on the stand, made no difference. The cases of Fentiman *vs.* Smith, 4 East, 107; Rex *vs.* Horndon on the Hill, 4 M. & Sel., 565; Hewlins *vs.* Shippam, 5 B. & C., 222; Bryan *vs.* Whistler, 8 B. & C., 288, and Wallis *vs.* Harrison, 4 M. & W., 538, are referred to as sustaining the decision in the case of Wood *vs.* Leadbetter. In Gale & Whatley's Law of Easements, 29, the result of all the decided cases is stated to be, " that a man may, in some cases, by parol license, relinquish a right which he has acquired in addition to the ordinary rights of property, and thus restore his own and his neighbor's property to their original and natural condition; but he cannot by such means impose any burden upon land in derogation of such ordinary rights of property; as for instance, a parol license will be valid for building a wall in front of his ancient windows, while a similar permission to turn a spout on his land, from a neighboring house, will be invalid and revocable." Tested by the law as here stated, the license in this case was clearly invalid, as it did impose a burden upon the land of the defendants, in derogation of what ordinarily belonged to it, and there can be no difference in principle, whether water is turned upon the land of another by means of a spout or a mill-dam. In the United States there are numerous cases to the same effect. Cook *vs.* Stearns, 11 Mass., 533; Stephens *vs.* Stephens, 11 Met., 251; Thompson *vs.* Gregory, 4 John., 81; Miller *vs.* Auburn and Syracuse R. R. Co., 6 Hill, 61; Mumford *vs.* Whitney, 15 Wend., 381. The cases of McKilliss *vs.* McIlhaney, 4 Watts, 317, and Woodbury *vs.* Parshby, 7 N. H., 237,

and upon which plaintiff's counsel principally relies, are admitted to lay down a doctrine in conflict with the views we have expressed ; but those cases are entitled to the less weight as they were both decided upon the authority of cases which have either been expressly overruled, or else do not sustain the conclusions they were cited to establish. Especially is this so as to the cases of Webb *vs.* Paternoster, Palmer, 71 ; Wood *vs.* Lake, Sayer, 3 ; and Taylor *vs.* Waters, 7 Taunton, 374 ; all of which are overruled, or shown to be without authority, by the decision in the recent case of Wood *vs.* Leadbetter.

The decree of the Circuit Court is affirmed.

*Decree affirmed.*