MORTON BREWING COMPANY and SARAH E. MORTON

*v.*

MARIAN L. MORTON.

1. Where a license has been so far executed that its revocation would work a fraud, actual or constructive, upon the licensee, equity will restrain such revocation, although its continuation results in an easement upon the lands of the licensor in favor of the lands of the licensee.

2. No distinction in equity arises out of the place where the works are erected under license, whether upon the lands of the licensor or licensee.

3. The owner of a brewery constructed, at considerable expense, a drain from the cellar of the brewery along the line of a neighbor's lot, by his consent, and connected it with a public sewer in a street upon which the brewery lot did not face, and maintained it for thirty years.  No particular time was fixed for the continuance of the drain..  Its continuance was of great consequence to the brewery, and worked little or no injury to the neighbor's lot.—*Held*, that the presumption, from the circumstances, was, that it was to continue as long as the necessity of the brewery required it, and that the owner of the adjoining lot ·should be restrained from disturbing it so long as the brewery lot was used for a brewery, or until a public sewer should be constructed in the adjoining street.

On final hearing on pleadings and proofs.

*Messrs. Coult & Howell,* for the complainants.

*Messrs. C. & R. W. Parker,* for the defendant.

PITNEY, V. C.

The dispute in this case is as to the right of the one party to use a drain or sewer running from her land across the land of the other party.   The complainant, Sarah E. Morton, is the owner, and the Morton Brewing Company is the lessee, under her, in possession of a brewery, situate on the west side of High street, in the city of Newark, and the defendant is the owner of a house and lot on the east side of High street, immediately opposite the brewery.   The drain in question leads from the cellar of the brewery across High street to the southwesterly corner of defend-·ant's property; thence, along the southerly edge thereof, to its southeasterly corner; thence, across a lot fronting on Burnett street and abutting on the rear of defendant's lot, to the public sewer in the last-mentioned street.   The occupants of the complainant's brewery have made use of this drain to carry away the waste-water and refuse fluids from the brewery continuously for a period reaching back, at least, to the year 1860.   The precise date is the principal and serious matter of fact in dispute in the cause.   Such use was made without objection on the part of the defendant, who claims to have owned her property, and who ·actually lived upon it during all that time.   Shortly before the filing of the bill, which was in March, 1889, the defendant was

about to close the drain, when the complainants applied to this court by their bill for an injunction, which was granted, and retained, after answer, until the final hearing.

The brewery was purchased by Thomas Morton, Jr., in 1852, by deed from Joel W. Condit. The title rested in Thomas until the 10th of March, 1885, when he conveyed it to the complainant, Sarah E. Morton ; but, from the first, it was occupied and used as a brewery by Thomas and his two brothers, John, who was the husband of the complainant, Sarah, and Robert, who was the husband of the defendant, Marian L. Morton—the three composing the firm of Morton Bros., under which name they carried on the business of brewing, on the premises, presumably as the tenants of Thomas, until sometime in or about the year 1877, when John Morton died. The business was continued by Thomas and Robert until the death of Thomas, shortly after which Robert conveyed the brewery plant and fixtures, the ownership of which seems to have been separate from that of the lot and building, to one Wilkins. At the same time the complainant, Sarah, leased the premises to Wilkins, and he assigned the lease and the plant and fixtures to the complainant, the brewing company.

It clearly appears that from the beginning of the business in 1852 a considerable quantity of water had at times come into the cellar of the brewery out of the shale rock from which it was dug, and, in addition thereto, a constant accumulation of wastewater and fluids necessarily resulted from the operation of the brewery, for all of which a vent was necessary. For that purpose an underground drain was in use, for the first few years, leading from the brewery into the street, and thence northerly, and of course with some declivity, along High street, until it came to an open drain crossing High street, called the "Renton sewer," and from thence, by a long and circuitous route, it reached Millbrook. This drain was subject to being obstructed, especially in winter time, and this liability to obstruction was a source of considerable annoyance to Morton Bros. in their business. The cause of this liability to obstruction does not appear; but I infer that it was

Morton v. Morton.

owing to a lack of sufficient declivity or fall between the cellar and the Renton drain.

In or about the year 1857 one of the first public sewers in the city of Newark was built in Burnett street, then known as North Orleans street, and situate parallel to and east of High street, and the waste-water from the brewery was shortly after conveyed to it by the drain now in question. The claim on the part of the complainants is, that this drain was constructed by and at the expense of the firm of Morton Bros., for the use of the brewery, by the license and consent of Robert Morton, then the owner of the defendant's lot, in or about the year 1857, and before any dwelling was erected upon it. The claim on the part of the defendant is, that it was constructed by and at the expense of the defendant, then the equitable owner of her lot, for the use of the dwelling now on the premises, and after it was erected, and that Morton Bros. afterward obtained permission to connect with it, as a matter of favor, for a short time only. The determination of the truth of this issue necessitates an examination of the evidence.

[Here follows a discussion of the evidence, which is omitted as unnecessary to an understanding of the case decided.—Rep.]

I come, then, without difficulty, upon the evidence, to the conclusion, that this drain or sewer was constructed in the first place by and at the expense of Morton Bros., probably in the winter of 1857–8, for the use of the brewery, by the license and consent of Robert Morton, who then held the legal title to defendant's lot, and with her acquiescence, and that it was afterwards, in 1869 or 1870, rebuilt, by substituting a pipe sewer where it crossed defendant's lot, by the same firm and at their expense, and by the license and acquiescence of the defendant.

The serious question in the cause is, what rights in the defendant's lot resulted from these facts to the owner of the brewery lot?

I think the court is justified in inferring, if not bound to infer, from the facts above stated, that the drain was constructed upon some agreement or understanding with Robert Morton for its use and continuance for some period of time, just how long it is not necessary for present purposes to consider. It would be unrea-

sonable to suppose that the firm would expend their money in constructing a work of this kind unless they had some assurance, express or implied, that they should have the use and enjoyment of it for some adequate period. It is also plain enough that there was a consideration moving to Robert Morton in the advantage which the drain would be to the business of the firm of which he was a member. I find, therefore, that there was a parol agreement by the owner of the freehold of defendant's lot to give to the occupants of the brewery lot, one of which was its owner, an easement of flowage from the brewery, and for its benefit, across the defendant's lot by means of a drain constructed by the owner and occupants of the brewery lot, and that such contract was executed by the latter at considerable expense in constructing the drain in 1857 or 1858, and in rebuilding it in 1869 or 1870, and that it was enjoyed by them from 1857 to 1887 without interruption. That this verbal license or agreement passed no interest whatever at law is of course clear, since not only is it impossible at the common law to create an easement which lies in grant by parol, but if this were otherwise, the statute of frauds is a positive bar.

But the complainants contend that this very defect in their standing at law gives them one in this court, on the score of such performance on their part of the contract or execution of the license—if it be a license—that it would work injustice and fraud upon them to permit either the original contractor or licensor, Robert Morton, or his grantee, the defendant, to recede from his agreement or revoke his license. In this contention I think they are right.

There is no proof in the case that either Thomas or John Morton knew that the defendant had any interest in her lot at the time this work was done; and, moreover, she swears she lived in plain sight of the lot in 1857 and 1858, and must have known what was going on. It was doubtful, to say the least, if the other brothers were chargeable with constructive notice of the void conveyance from Robert to defendant of August 1st, 1860, recorded in 1865, and the valid conveyance was not made until 1879. In the meantime the firm had replaced the stone drain

on the defendant's lot with a pipe sewer, and either the firm, or Thomas Morton, individually, had made large additions in the way of buildings to the brewery. All this defendant saw, and it does not appear that she made any objections to any one, unless to her husband.

Although the drain was built by the firm, yet the easement involved in its use became and was appurtenant to the brewery lot used by the firm. Presumably the question of compensation between the firm and Thomas Morton was arranged in adjusting the rent.

The principle upon which courts of equity interfere in cases like the present is familiar and well settled. It is to prevent the one party from taking advantage of the lack of a formal writing to work a fraud upon the other. Chief-Justice Gibson, in *Rerick v. Kern, 14 Serg. & R. 267*, says: "A license may become an agreement on valuable consideration, as where the enjoyment of it must necessarily be preceded by the expenditure of money; and when the grantee has made improvements or invested capital in consequence of it, he has become a purchaser for a valuable consideration." And again: "It may safely be affirmed that expending money or labor in consequence of a license &c. has the effect of turning such license into an agreement." And the same court, in *M'Kellip v. M'Ilhenny, 4 Watts 317* (at *p. 322*), says: "Whenever a party has induced another, upon the faith of his promise, though verbal, to expend his money or labor, for which he can only be remunerated by the enjoyment of the thing promised, equity will compel the promisor to give such a deed in writing as shall be requisite to secure the promisee a perfect enjoyment of what was promised." The learned editor of *2 Am. Lead. Cas. (4th ed.) 761*, expresses it thus: "From the moment, therefore, that a license has been so far executed that its revocation would be an actual or constructive fraud on the licensee, chancery will view it as an equitable interest or estate, which may, like other equities, be made the subject of a grant by the licensee, and will be binding on every one claiming through or under the licensor with notice of its existence." Professor Pomeroy also puts it on the ground of specific performance of a parol contract

partly performed. *Pom. Spec. Perf.* § *132*. And Judge Waterman does the same thing in his book on *Specific Performance of Contracts* § *283*.

The principle has been adopted by the court of appeals of this state, in *Raritan Water Power Co.* v. *Veghte, 6 C. E. Gr. 463*, and in many other states.

The defendant argued, with much earnestness, that the doctrine, as settled in this state by *Raritan Water Power Co.* v. *Veghte*, restricted relief in equity to cases where the license or agreement was in writing. But this is a plain misconception of the scope of that case. The license there was in writing not under seal and not in the form of a grant, and it was argued by the company that this, though inefficient to create an easement in an individual at law, was still efficient as a grant to the corporation to which it was given, by reason of a peculiar provision in its charter. See *4 C. E. Gr. 152, 153*. The court of appeals, differing in this matter from the chancellor, held that such would have been the result if the license had been in fact signed and given to the corporation after the charter was granted, but found, as a matter of fact, that it was signed before the passage of the act of incorporation, and given to the individuals who were afterward incorporated, and for that reason dealt with it as a simple parol license; and no additional strength was attributed to it because in writing. This is manifest from the language of the opinion, where it thus states the rule (*6 C. E. Gr. 475*): "Where improvements of a permanent nature have been made by a person on his own land, the enjoyment of which depends upon a right recognizable by the law, affecting the land of another, to which his consent is necessary, and where such consent is expressly proved or necessarily implied from the circumstances, and the improvements have been made in good faith upon it, equity will not permit advantage to be taken of the form of the consent, although not according to the strict mode of the common law, or within the statute of frauds." The language used shows that the court had in mind a case where there was no writing.

A more serious question is that arising out of the so called distinction between a license to do something on the land of the

licensor, and one to do something on the land of the licensee. The latter only is included in the canon above recited, found in the opinion in *Raritan Water Power Co.* v. *Veghte.*

But I am unable to perceive that there is any solid distinction of the kind applicable in this court to a case like that in hand. The license here was, first, to enter upon and construct a drain on the licensor's land, and, second, to enjoy it by a continued use of it, not necessarily involving any entry on the land. The first is a license pure and simple, and is a protection at law for all acts done under it before revocation. The second is an attempt to create an easement which is inoperative at law for want of a grant, but it is of precisely the same character as the easement of flowage created by a dam on the land of the licensee. It makes a use amounting to an easement of the land of the licensor for the benefit of the land of the licensee. It was at one time supposed, and held by several courts, that a license to do an act on the land of the licensee, which resulted injuriously to the land of the licensor, was irrevocable at law; and it was just here that the distinction in question had its origin, and it was confined, so far as I can find, to cases at law. But this distinction has been so far exploded as to confine it, at law, to cases where the execution of the license, on the land of the licensee, has the effect merely to extinguish an easement previously enjoyed by the licensor in the land of the licensee, which was the case in *Winter* v. *Brockwell, 8 East 308.* See *Bridges* v. *Purcell, 1 Dev. & Bat. 492; Foot* v. *Railroad Co., 23 Conn. 214; Woodward* v. *Seely, 11 Ill. 157,* and the comments of the learned annotator in *2 Am. Lead. Cas. (4th ed.) 765–770; Gale & W. Easem. \*43; Godd. Easem. (Perk. ed.) 472; Washb. Easem. \*560.* And the right at law of the licensor to revoke a license to erect a structure on the land of the licensee, which, if continued, would create an easement in the land of the licensor, seems to be thoroughly established. *Wood* v. *Leadbitter, 13 Mees. & Wels. 838.*

I think that the principle underlying *Raritan Water Power Co.* v. *Veghte* clearly covers the case of a structure erected or an excavation made on the land of the licensor, whose use by the licensee amounts to an easement, and it has been so held in many

cases. *Hodgson* v. *Jeffries, 52 Ind. 334,* was a case of a drain-
or water-way dug, as here, from the land of the licensee across the
land of the licensor for farm drainage purposes, and the licensee
was protected in its continued use by the court, acting upon
equitable principles. *Cook* v. *C., B. & Q. R. Co., 40 Iowa
451,* where the license was to dig a ditch on the licensor's land,
and thereby change the channel of a natural stream. *Duke of
Devonshire* v. *Elgin, 20 L. J. Ch. (N. S.) 495,* was a case of a parol
license to maintain a water conduit across a licensor's land to
supply a village with water. To the same effect is *Lefevre* v.
*Lefevre, 4 Serg. & R. 241. Mold* v. *Wheatcroft, 27 Beav. 510
(6 Jur. (N. S.) 2, 29 L. J. Ch. (N. S.) 11),* was a case of a right
of way.

Another point made by the defendant was, that this license
was personal, and did not pass by the conveyance from Thomas
Morton to the complainant. But this point is clearly covered by
*Raritan Water Power Co.* v. *Veghte.*

The defendant, in her answer, sets up and relies upon a deed
for her lot executed to her by Thomas Morton while he was the
owner of the brewery lot, in which no reservation is made of the
right now claimed. She does not plead this deed as a release,
but apparently states it as a circumstance tending to show that
Thomas did not claim any right. The object of the deed forbids
its use for any purpose whatever by the complainants in this case.
Being advised that the deed of conveyance from her husband to
her of August 1st, 1860, was inoperative, her husband, in order
to make it valid, conveyed the lot to his brother Thomas by deed
of June 23d, 1879. He was a bachelor, and he conveyed it, on
the same day, to the defendant. In the deed to Thomas refer-
ence is made to the previous attempted conveyance of August 1st,
1860, and then follows these words: "And this deed is given for
the purpose of enabling the grantee herein to convey the above-
described premises legally to said Marian L. Morton." This
clause and the circumstances are sufficient, in my judgment, to
protect the complainants in equity from any effect from that con-
veyance except such as will serve to transfer the title from the
husband to the wife; and in fact the claim, that it could affect

complainants' claim herein, was not seriously insisted upon at the argument.

The difficult problem is to determine how long, according to the original agreement, the use of the drain or sewer was to be continued.

[Here follows a statement of the evidence which is unnecessary to be published.—Rep.]

I am not satisfied that the continuance of the use of the sewer was limited in the manner sworn to by the defendant. In the first place, it is not probable the firm would have incurred so much expense upon such terms. What was probable enough in case the drain had been built at the expense of the defendant, as she insists it was, becomes highly improbable upon the other assumption. In the next place, it does not at all appear that it has been at any time at all practicable to drain the brewery into either of the public sewers in question. The evidence in the case is, that the general surface of High street, at that point, inclines to the north, which would prevent drainage into the James street sewer, and the same difficulty which was encountered in draining into the Renton drain would be encountered in tapping the Orange street sewer, which is still further to the north.

The presumption is, that the agreement between the parties was that the use of this sewer was to continue as long as it was reasonably necessary—in the limited sense of that term adopted for such purposes by the courts—for the use of the brewery, and such presumption is strengthened, in the present case, by the continued use which has actually been had of it. In *Rerick* v. *Kern, supra,* Chief-Justice Gibson says : "A right under a license, when not specially restricted, is commensurate with the thing of which the license is an accessory. Permission to use water for a mill, or anything else that was viewed by the parties as a permanent erection, will be of unlimited duration, and survive the erection itself, if it should be destroyed or fall into a state of dilapidation" &c. This language is quoted, with approval, by Judge Woodward, in *Thompson* v. *McElarney, 82 Pa. St. 174;* and I understand the doctrine to be, in substance, involved in the decision in *Raritan Water Power Co.* v. *Veghte.* This presump-

Morton *v.* Morton.

tion is strengthened in this case by the importance of the drain to the brewery and the very slight injury, if any, that it does to the defendant's property. Its importance to the brewery is testified to by the defendant in a letter written by her to the brewing company, under date February 28th, 1889, in which she demands $300 a year for its continued use, and says:

"I am informed that a brewery cannot exist without sewerage. Morton Bros. experienced a great deal of trouble from the sewer belonging to that brewery, and lost many a brewing on account of foul air arising from imperfect drainage."

On the other hand, there is no pretence that, after the pipe sewer was put in, in 1869–70, any appreciable inconvenience has arisen from its presence on defendant's lot. In fact, the proof leaves it in doubt whether it is not quite as much, if not more, upon the adjoining lot as upon defendant's. Her lot is twenty-four feet front and rear. She swears her house is twenty-three feet wide, and that there is an alley-way of about three feet between it and the house next to hers on the south, through which alley this drain is laid, and which, by an agreement between the owners, is subject to the use of both houses. She was evidently in doubt whether her title runs to the middle of this alley or not. Be that as it may, it seems impossible to suppose that when the pipe sewer was put down, in 1869–70, it was laid wholly upon the one foot, or, possibly, eighteen inches, of land in that alley-way that belonged to the defendant. The probability is, that it was laid in the centre of the alley, and quite as much on the adjoining lot as on the defendant's. The land covered by it is so burdened by the common easement of passage as to practically forbid its use for building purposes.

The brewing company claims an additional equity against the defendant in the circumstances attending the leasing of the brewery lot from Mrs. Sarah Morton, and the purchase of the plant and fixtures from Robert Morton. It appears, as before observed, that the ownership of the plant and fixtures of the brewery, including engines, pulleys, malt mills, elevators, coolers, pumps and hoisting machines, besides the horses and wagons,

had been kept separate from the lot itself, and was owned by the
:firm of Morton Bros., and was in the hands of Robert Morton,
as the surviving partner.   He, in 1885, conveyed it, in considera-
·tion of $14,000, to Mr. Henry Wilkins, who, in addition to this
plant, bought of Robert, afterward, a lot of casks at an expense
·of $6,000.   Cotemporaneous with this purchase of the plant was
the lease of the brewery from Mrs. S. E. Morton to Mr. Wilkins,
which is dated November 25th, 1885.   Now, it is probable, and
was shown, that the two transactions—the purchase of the plant
and the lease of the brewery—were, in substance, one.   Mr.
Wilkins says that he would not have bought the plant unless he
could have got the lease of the brewery, and in fact he negotiated
in part for the lease through Mr. Robert Morton.   The negotia-
tion for this purchase and lease occupied some time, and in the
·course of it Mr. Wilkins saw Mr. Robert Morton at his house,
and swears that he saw him in the presence of the defendant, and
that the matter was, to some extent, spoken of in her presence.
I find it impossible not to believe that the defendant, who was
much younger than her husband, and who took an active interest
in his affairs, did not know of this proposed purchase and lease;
:and she ought to have known that Mr. Wilkins was taking this
lease upon the faith, among other things, that the brewery had a
regular system of drainage, and she knew that such drainage was
:across her lot.   Now, it seems to me that fair dealing on the part
·of her and her husband required that if they intended to stop
this drain they should have notified Mr. Wilkins of their inten-
tion, but they did not, and permitted him to go on and lease the
brewery and buy the plant at an expense of $20,000 upon the
faith of the existence of that drain.

Upon a review of all the circumstances—the construction of
the drain by Morton Bros., its great importance to the brewery,
the slight injury, if any, to the defendant's lot, its long continu-
:ance there—I think that, independent of any element of estoppel
to be found in the circumstances attending the purchase of the
plant and the leasing of the premises, the complainant, Sarah E.
Morton, as well as the brewing company, is entitled to an injunc-

tion restraining the defendant from disturbing this drain as long as a brewery shall be maintained upon her lot and until a public· sewer is laid through High street.