Metcalf v. Hart.

CONAWAY and MERRELL, JJ., concur.

---

SMITH v. CITY OF CHEYENNE.

(October 13, 1891.)

---

METCALF v. HART.

(October 26, 1891.)

INJUNCTION AND SPECIFIC PERFORMANCE—PARTIES — LACHES — CONTRACTS —JUDGMENT—LICENSE— IMPROVEMENTS—INTEREST—RENT—DISMISSAL OF APPEAL.

1. Where the widow alone has brought ejectment for lands of her deceased husband, the person in possession may, by suit in equity, seek not only the enjoining of the action, but also the specific performance of an agreement to convey the lands, or an allowance for improvements thereon, without making the other heirs parties; he having a right to defend his possession by suit, and no multiplicity of actions being occasioned by seeking other relief in the same suit.

2. Some of the time prior to the bringing of the suit having been occupied with mutual negotiations for settlement, and complainant having all the time been in possession of the land, he cannot be charged with laches in bringing his suit, where it was brought immediately after the commencement of the action of ejectment.

3. Complainant claimed in his pleadings, and endeavored to show by his evidence, that he was entitled to an injunction restraining defendant's action at law on her legal title for possession, and that he was also entitled to conveyance of the property from defendant, or at least to the value of his improvements thereon. Defendant's pleadings and proof were intended to show the contrary of all this, and that she should be dismissed, with her costs, which was the only relief asked for by her. *Held*, that it was error after trial to allow defendant to file a cross-bill, and on this, without any issue being joined or any opportunity given complainant to answer, to include in the decree a finding and judgment in favor of defendant for possession and the value of the rents and profits, to be ascertained by reference.

4. Complainant and others went onto land in the possession of defendant's husband under a desert-land entry, and erected buildings thereon, on his promise, made for the purpose of encouraging the building of a town on the land included in his entry, that on acquiring title he would sell and convey to each resident who should have improvements on the land the portion occupied by such improvements at a nominal price. *Held* that, on account of the elements of uncertainty as to the value of improvements to be made, the exact amount of land to be deeded, and the price to be paid, this could not be specifically enforced as a contract.

5. After the death of defendant's husband she made a contract with the people of the town, which was signed by her individually, but which recited that she, as administratrix of her deceased husband, agreed, on obtaining a patent for the land, to sell to the parties in possession certain lots on terms and conditions therein given. Thereafter a patent was issued in her deceased husband's name, accruing to the benefit of his heirs. *Held* that, even if the condition on which she was to convey was thus satisfied, the contract was made on the mistaken supposition that she would then be able to sell the land as administratrix, and therefore it would not be enforced against her as to land obtained by her on distribution of the estate.

6. The promise of defendant's husband, though too indefinite to be an enforceable contract, became, when acted upon, a license coupled with an interest, so that it could not be revoked without compensating complainant for his improvements.

7. Defendant having offered to deed to complainant for a few dollars all the land he was entitled to, sufficient front to clear the store he had erected, and the depth of a lot back, and he

having demanded in addition an adjacent lot, he should be charged with the costs of the suit, and also of the actions of ejectment which he sought by his suit to enjoin.

8. Complainant is not entitled to interest on the value of his improvements.

9. Defendant could not be deprived of his possession without being paid for his improvements, and therefore, though possession was demanded, he cannot be charged with rent. GROESBECK, C. J., dissenting.

#### ON REHEARING.

A decree appealed from was for the surrender of the realty in controversy, and directed a reference to ascertain the value of the rents and profits. *Held* that, after the decree has been declared erroneous on appeal, a motion to dismiss the appeal, on the ground that it was prematurely taken because it was not final, will not be sustained, since the effect would be to send the cause back to the trial court, to enable it to ascertain the amount of rents and profits to which, by the reversal of the decree, it was decided no one was entitled.

Appeal from district court, Johnson county; M. C. SAUFLEY, Judge.

Suit by Ed. D. Metcalf against Juliet W. Hart to enforce the conveyance of real estate, and to enjoin actions of ejectment therefor. Decree for defendant, and complainant appeals. Reversed.

*Charles N. Potter* and *J. J. Orr,* for appellant. *William Ware Peck* and *Carroll H. Parmelee,* for appellee.

CONAWAY, J. This is a suit for specific performance of certain alleged contracts for the conveyance of realty, and to enjoin the holder of the legal title from prosecuting actions of ejectment at law for the possession of such realty. Defendant and appellee, Juliet W. Hart, holds, and since June 28, 1884, has held, the legal title to the property in question. Complainant and appellant, Ed. D. Metcalf, holds, and since an earlier date has held, possession of the same, claiming an equitable right thereto. The property consists of lots 1, 2, and 3, and the northerly 5 feet of lot 4, in block 1, and lot 11, and the southerly 8 feet of lot 12, and the northerly 6 feet of lot 10, in block 18, in the town of Buffalo, Johnson county, Wyo. All of this property was included in a desert land entry made by Verling K. Hart, June 9, 1879. He died intestate, February 17, 1883, having made final proof and payment under his desert-land entry September 27, 1882; and patent for the land was issued in his name, accruing to the benefit of his heirs, January 19, 1884. The legal title of defendant and appellee she derives as widow and one of the heirs of said Verling K. Hart, deceased, and by virtue of proceedings in the probate court of said county of Johnson for the settlement and distribution of the estate of her deceased husband. The other heirs are three minor children of herself and the deceased. The equitable title of complainant and appellant he derives from an alleged promise or agreement made by Verling K. Hart, for the purpose of encouraging the building of a town upon the land included in his desert entry, that upon acquiring title he would sell and convey to each resident who should have improvements upon said land that portion occupied by such improvements at a nominal or small price. Complainant claims that on account of such promise he occupied the land described as in block 1 in the spring of the year 1882, and then and afterwards made valuable improvements upon it. He also claims that the land described as in block 18 was occupied and improved in the summer of 1882 by one William Burgess on account of said promise of said Verling K. Hart, and with his knowledge, and without any objection by him, and that complainant succeeded to the rights of said Burgess by purchase in 1883, and has ever since held possession of this property. After the death of Verling K. Hart, and before the issue of the patent for the land included in his desert entry, a number of the citizens of Buffalo made affidavits and protests against the issuing of the patent. This resulted in an instrument in writing in the form of a contract with the people of the town of Buffalo, dated September 20, 1883, and signed by Juliet W. Hart, who is described in the body of the instrument as administratrix of the estate and guardian of the minor children of Verling K. Hart, deceased, stating terms and conditions upon which she would, upon obtaining a patent from the United States for the land upon which the said town is situated, sell to the parties in possession certain lots within said town. It is to be observed that the plat of this town dividing it into lots, establishing streets and alleys, etc., in fact making it a legal, unincorporated town under the laws of the territory of Wyoming, was not filed in the office of the county clerk till July 29, 1884, more than 10 months after the date of this alleged contract for the disposal of lots in the town. One of the conditions upon which Mrs. Hart so agreed to convey lots on the terms in the said instrument spec-

Metcalf v. Hart.

ified was that no further delay should be caused nor any expense incurred on account of affidavits or protests which had already been made, or which might thereafter be made, in opposition to the issuing of a patent by the United States for said land. Complainant claims also under this contract.

Before the commencement of this suit defendant had begun two actions of ejectment against complainant for the possession of the realty described as in block 1 and in block 18, respectively. Complainant asks that defendant be enjoined from further prosecuting said suits, and asks for a decree for the specific performance of said alleged contracts for the conveyance to him of said realty, or, if that be denied, that the value of his improvements be ascertained and allowed to him, and made a lien upon the property. The answer of defendant denies that Verling K. Hart ever promised to sell or convey any portion of the land embraced in his desertland entry upon obtaining patent therefor to settlers making improvements, or to any person or persons for a nominal price, or any price; denies that he ever encouraged or permitted such settlements or improvements to be made on the land; denies that he knew the improvements of complainant or Burgess were made; denies that the instrument of date September 20, 1883, is a contract which may be enforced; denies that the conditions upon which it was to take effect ever came to pass; and asks that she be dismissed, with costs. These, in brief, are substantially the issues made by the pleadings in this suit, and upon which the cause was tried, the evidence taken, and the cause argued and submitted, in the district court.

A preliminary objection to the bill is made by defendant that the other heirs of Verling K. Hart, deceased, should have been made parties defendant; that the claim of complainant is a charge upon the interest of all the heirs in the real estate; and that all should have been joined as defendants, to prevent a multiplicity of suits. It is sufficient to say upon this point that defendant herein alone is claiming the property, and that she alone brought the actions of ejectment against complainant for its possession. Complainant has a right to defend his possession by proper suits when assailed, and it occasions no multiplicity of actions to seek other relief in the same suit or suits.

It is also urged that complainant is chargeable with laches in not bringing his suit sooner, and therefore should not be allowed to prosecute his suit now. The delay is not claimed to have occurred since the commencement of the actions of ejectment by defendant. Any delay prior to that time is chargeable to her at least equally with complainant. Some of the time was occupied with mutual negotiations for settlement, and, besides, complainant was in possession of the property. If wrongfully so, it was incumbent on defendant to put him out of possession without undue delay, at least to as great an extent as it was upon him to perfect his title.

The court below found in favor of defendant; found that the possession of complainant was wrongful and tortious since June 28, 1884; and dismissed his original and amended bills; and, among other things, gave judgment against him for costs. So far this is just the relief, and all the relief, sought by defendant in her answers to complainant's original and amended bills, and leaves her at liberty to prosecute her actions of ejectment for the possession of the property, and for damages for its detention, if she so desire,—causes of action which might be joined by the law in force at the time these actions were begun and still in force. And this would seem to be an adjudication upon all of the issues made by the pleadings. But the court below did not stop here. In its decree is embodied an order allowing defendant to file a cross-bill. Accordingly we find a cross-bill of defendant indorsed as filed the same day of the rendering of the decree, December 13, 1889. We also find that the motion for leave to file this cross-bill was made only the day before, and taken under advisement by the court. Under the issues in the cause (for no issue was made, or could have been made, under this cross-bill) all the relief asked for by defendant was "to be hence dismissed, together with her reasonable costs and charges in this behalf incurred and sustained." When the two actions of ejectment were begun, and when this suit was begun, the law practice and chancery practice were separate. The defense in this suit, up to the day before the rendering of the decree, was evidently conducted upon the idea that it was best for defendant's interest not to ask any affirmative relief in this suit, but merely to oppose and defeat complainant's application for

a conveyance of the property, and for an injunction; and then proceed to assert her legal title, and to prosecute her actions for possession and damages on the law side of the court, unincumbered by equitable considerations or defenses,—a course which would seem to commend itself to any prudent practitioner. Defendant may have desired a jury trial in those actions, to which either party was entitled, and which would have been specially appropriate in the assessment of damages, rental values, etc. But this cross-bill asks additionally for a judgment and decree against complainant, Ed. D. Metcalf, for the possession of the property, and for $9,000 for the use, enjoyment, rents, issues, and profits thereof, and for interest on this sum from March 31, 1887; and the decree contains a finding and judgment in favor of the defendant for the possession of the property, and for the value of the use, enjoyment, rents, issues, and profits thereof, from September 5, 1885, and orders a reference to a master to take testimony and ascertain those values. These values had not been ascertained, because they were not in issue.

What induced this very radical change in the views of defendant as to the relief she ought to seek in this particular suit the transcript of the record before us does not disclose. But the brief of her counsel filed herein informs us that the case was heard at the June term, 1889, of the district court, and reserved for consideration, and that in September, 1889, the district judge filed an opinion. This opinion is quoted at length in the brief. No cross-bill had then come to light. The pleadings were the original and amended bills of complainant, considered together as one bill, it seems, without objection, and the answers thereto by defendant, and the replication by complainant. The complainant claimed in his pleadings, and endeavored to show by his evidence, that he was entitled to an injunction restraining the possessory actions at law of defendant upon her legal title, and to a conveyance of the property in controversy to him from defendant, or, if this should be denied, at least to the value of his improvements. The pleadings and proofs on the part of the defendant were intended to show the contrary of all this, and that defendant should be dismissed, with costs, and left at liberty to pursue her actions at law. For this she asked, and for nothing more. The opinion of the learned chancellor who tried this cause in the court below was against the complainant on every branch of his case, and denied him all of the relief sought. It also indicated that a decree should go against him for the possession of the property, and for rent from date of defendant's commencing the suits of ejectment, or from September 7, 1885, whichever was earliest; and that complainant should be allowed nothing for improvements, but should be allowed for taxes actually paid by him. The opinion then proceeds: "The cause having been brought in equity to enjoin the prosecution of an action of ejectment, and to compel a conveyance of the property, it falls within that category of cases where the chancellor, being possessed of the whole case, shall render all the relief to which the parties are entitled." This principle is entirely correct, but it applies just to the "whole case," and nothing else. And the "whole case" is just the case made by the pleadings, and is constituted of the issues formed by the pleadings, and nothing else; and the relief which the chancellor may render is such, and only such, as the parties show themselves entitled to by their pleadings, and by evidence pertinent to those pleadings; and the prayer for relief is part of the pleadings.

In this case, at the time of the filing of this opinion of the chancellor, there was no prayer for affirmative relief by defendant at all. She had filed no cross-bill; neither any pleading setting up grounds for or claiming affirmative relief. As already stated, she merely asked to be dismissed, with costs, and she made no prayer for general relief. The rule upon this subject, in which all the authorities concur, is well stated by Black in his recent valuable work on Judgments: "According to the settled practice in equity, the rule in regard to decrees is similar to that just stated, as governing judgments at law, viz., that it is error to decree relief not sought in the bill. In other words, if the complainant has prayed for specific relief in the premises, or relief as to a specific subject-matter, no more extensive relief can properly be accorded to him." 1 Black, Judgm. § 141. This language mentions complainants only, but the same rule applies to defendants when they seek affirmative relief. They then become complainants in effect, if not in name. There are some authorities to the effect that relief may be granted which is not asked for in the formal prayer for relief, but such

Metcalf v. Hart.

relief must be within the issues, and the bill somewhere must show that the party is entitled to it, even where there is a prayer for general relief. Further, a judgment or decree outside of the issues is without jurisdiction and void. We quote again from Black: "Besides jurisdiction of the person of the defendant and of the general subject-matter of the action, it is necessary to the validity of a judgment that the court should have had jurisdiction of the precise question which the judgment assumes to decide, or of the particular remedy or relief which it assumes to grant. In other words, a judgment which passes on matters entirely outside the issue raised in the record is so far invalid." Id. § 242. There was no issue joined or tendered in this case as to the right of possession. The issue was as to the conveyance of the bare legal title to one who already had possession, under claim of the equitable right to both title and possession. There was no issue as to rents and profits. All that was said by defendant in her pleadings upon that subject when the case was tried was in the concluding paragraph of her answer to the original bill, in these words: "And defendant further says that complainant has derived great benefit and emolument from the use of said premises, much greater than the value of any improvements by him placed thereon, for which this defendant, nor Verling K. Hart, deceased, ever received the slightest compensation. Wherefore defendant asks to be dismissed with her costs, and reasonable charges in this behalf incurred." Such was the state of the case at the June term, 1889, when the case was tried and submitted. Such was the state of the case in September, 1889, when the opinion of the learned chancellor was filed. How was it on December 13th of that year, when the decree was rendered?

It would appear that defendant, finding relief which she had not sought in the case about to be cast upon her, endeavored to prepare a pleading to sustain the proposed decree. On December 12th she presented her cross-bill, and moved for leave to file it. This motion was taken under advisement. The next day the decree in the cause was rendered, including an order sustaining defendant's motion for leave to file her cross-bill, and granting her all the relief asked for in her cross-bill, except interest. From this decree complainant appeals. The statute in regard to cross-bills, in force when this suit was begun, and under which it must be concluded, is found in the Compiled Laws of 1876, as follows: "Sec. 681. Any defendant may, after filing his answer, exhibit and file his cross-bill, containing his interrogatories to the complaint or complaints, [complainant or complainants is evidently meant,] and call upon him or them to make answer thereto. In such case, the complainants shall be held to answer, plead, demur, or except to such cross-bill in the same manner and under the same penalties that a defendant or defendants are hereinbefore required to answer, plead, demur, or except to an original bill. If the cross-bill is filed in term-time, the complainant or complainants shall answer within such time as the court may order; if filed in vacation, the complainant or complainants shall answer such cross-bill within the time hereinbefore prescribed for defendants to answer original bills; and the issuance, service, and return of subpœnas or publication of notice in case of non-residents shall be the same as hereinbefore provided in the commencement of actions in chancery."

The argument of defendant is that this section by its terms applies only to cross-bills seeking discovery. The interrogatory clause is omitted from defendant's cross-bill. Therefore, it is claimed, this section does not apply, and the common-law rule governs. If this be so, which is not admitted, no common-law rule has been shown denying complainant the opportunity to answer a cross-bill. It is further argued that the relief sought by the cross-bill is only such as results to defendant from her successful denial of complainant's original and amended bills, and such as might have been claimed in her answers to those bills, and therefore her cross-bill admits of no answer. This is a *non sequitur*. Admitting that the claims for the very important affirmative relief demanded by the cross-bill might have been set up in the answer of defendant, they would then have been denied by the replication, and would have been in issue when the cause was tried and submitted. As it is, they have never been in issue at any time.

The doctrine of estoppel is invoked against complainant. It is claimed that, by his pleadings and proofs already in the record, he would be estopped from setting up any possible defense to the matters al-

Metcalf v. Hart.

leged in the cross-bill, if allowed the opportunity. After stating in their brief matters which they consider established by complainant's pleadings and proofs, defendant's attorneys say: "He was estopped from denying any of these facts; he could have answered only by denying them." We are not prepared to say, as matter of law, that every possible defense that complainant might make to the new matter of the cross-bill, or any portion of it, is admitted away by his pleadings or proofs upon other issues. Were such a thing possible, even then complainant would have a right to an opportunity to answer the cross-bill, if he could do nothing more than confess a decree, and save additional costs. In other branches of the case defendant's attorneys have shown great industry in citing numerous authorities to support their positions. To sustain their argument that complainant was not entitled to an opportunity to answer defendant's cross-bill, they have not cited one. It is not likely that such an authority can be found in the history of English or American jurisprudence. The statement of the proposition is its own refutation. No argument can make the error plainer. The decree in this case, in awarding to defendant possession of the property in question, and in awarding process to put her in possession, and in awarding to her rent, goes outside of the issues as shown by the record. It is as if a man and his wife should be parties to a suit involving her homestead rights, and evidence should be admitted tending to show incidentally that they were not living happily together, and the court should proceed of its own motion to divorce them. The decree in this case, for error in attempting to adjudicate on matters not in issue, must be reversed.

The decree has also adjudicated the matters properly in issue; that is, the question of the specific performance of the alleged contracts, the question of compensation for complainant's improvements, and the question of enjoining the prosecution of the two actions of ejectment. It is therefore necessary to examine this adjudication, and to determine as to its correctness.

As to the alleged contract of Verling K. Hart to give title, when he should himself obtain title by patent, to occupants of the land who had made improvements thereon. At the time these promises or representations were made

Hart had no title, and could give none. It is not alleged that he promised to procure title, or to make any effort to procure title. This consideration, while not conclusive, seems unfavorable to complainant's equities. Neither is there any allegation or proof as to the amount or character of improvement that would be required of the settler to entitle him to the benefit of the alleged promise. Improvements are spoken of, and the building of a burgh. An improvement might be a large business house or a pig-sty; and the building of a burgh might consist, in part, in the erection of one or the other, or both. It would seem that Hart considered that he had a right to object to the construction of inferior buildings on his land, and in one case intimated that he did not regard such as entitled to consideration. Neither is the quantity of land fixed to which a settler would be entitled on account of improvements of any character. Fischer speaks of a lot. McCray mentions improved lots and adjoining lots as though two lots were intended to accompany each "improvement." Neither is any price fixed. It was to be a small price, or a nominal price. Large latitude is not excluded by these terms. In McCray's testimony he speaks of a nominal figure that would about pay the expense of platting, etc., and says he thought $10 for improved lots, and $25 for adjoining lots, too low; that he would fix the figures at $25 and $40 or $50. It may well be doubted whether the settlers generally would consider these prices nominal, or whether they can properly be called nominal; and McCray mentions one amount as a nominal price for improved lots, and a different and larger amount as a nominal price for adjoining lots. These terms "nominal prices" and "small prices" leave much room for controversy. A contract cannot be specifically enforced when it leaves any of its terms open to future treaty, or to be afterwards settled. These elements of incompleteness and uncertainty in the alleged contract are fatal to a claim for specific performance.

This brings us to the written instrument of September 20, 1883. The first clause of this instrument reads as follows: "Know all men by these presents that I, Juliet W Hart, administratrix of the estate and guardian of the minor children of Verling K. Hart, deceased, do hereby covenant and agree, to and with the people of the town of Buffalo Wyo that I will, upon

obtaining a patent from the United States for the land upon which the said town is situated, sell to the parties in possession certain lots within said town upon the following terms and conditions." Then follow the terms, and the closing clauses are the following: "All of which is covenanted upon condition that no further delay is caused, or any expense incurred, on account of affidavits or protests which have already been made, or which may hereafter be made, in opposition to the issuing of a patent by the United States for said land. Witness my hand and seal this 20th day of September, A. D. 1883. JULIET W. HART. Witness: H. S. ELLIOTT." This contract is signed simply, "Juliet W. Hart." This suit is brought against Juliet W. Hart. It is thus treated as the individual contract of Juliet W Hart; as her individual covenant and agreement, upon obtaining a patent from the United States, to sell certain portions, or it may be uncertain portions, of the land. That contingency, upon which this contract was to take effect, if this view be the correct one, has never occurred. Juliet W. Hart never obtained a patent for the land.

It may be said that Mrs. Hart was endeavoring to secure the issue of the patent upon the desert-land entry of her deceased husband, and that the phrase "obtaining a patent" in the contract merely means so securing the issue of that patent. There are many things to sustain this view. This is the patent which all the parties interested were discussing. This is the patent the issue of which the citizens were opposing. This is the patent which defendant, Mrs. Hart, sought to free from further opposition. This patent seems to have been regarded by the people as empowering Mrs. Hart, as administratrix, to sell portions of the land. It had not occurred to Mr. Elliott that this was not the case, and he represented the people of Buffalo. If such is the meaning of the phrase "obtaining a patent" in the contract, then the contract is one which it was and is simply impossible to perform according to its terms. The issue of the patent to Verling K. Hart gave Juliet W. Hart no power or authority to sell or convey any of the land. It gave her no such authority, either individually or as guardian, or as administratrix, or as widow and heir, or in all four capacities put together. It may be said that Mrs. Hart, having contracted to sell and

v.3wyo.—19

convey property to which she had no title at the time, on afterwards acquiring title from any source should be held to sell and convey according to her contract: that the source of the title is not material; that the qualification, "upon obtaining a patent," in the contract, is not a material part of the contract, and may be rejected as immaterial or as surplusage, and the contract enforced without it. This is dangerous ground. Such a course in this case would evidently change the meaning and intent of the contract from what was in the contemplation of the parties at the time it was made and accepted. The parties evidently acted under the impression that, upon the issuing of the patent to Verling K. Hart, Juliet W. Hart, as administratrix of his estate, could convey out of such estate before distribution the portions of the realty belonging thereto which are called for by this alleged contract. This would have reduced the estate to the diminution of the inheritance of all the heirs in proportion to their interest. This is evidently what was intended, and not that the contract should be filled out of the share of one heir after distribution. It could not be known, when the so-called contract was made, which heir would get the property described, or whether any of them would. It might have been necessary to sell it to pay intestate's debts. The time fixed for the performance of the contract, "upon obtaining a patent," sustains this view, and it is consistent with no other. No time is allowed for distribution. No such contingency was provided for, or, it seems, thought of. If the phrase in the contract "obtaining a patent" means the issuing of the patent to Verling K. Hart, then it follows, from the foregoing considerations, that the contract cannot be enforced according to its true intent and meaning. If the phrase has its natural meaning, according to the order and sequence of words in the contract where it occurs, and means the obtaining of a patent by the contracting party, Juliet W. Hart, in her own right, then that contingency upon which the contract should take effect has never occurred. In either view, the action for specific performance must fail. There are other considerations leading to the same result, but these seem to be controlling and conclusive.

Then the question remains, what is the true relation of this complainant to the

Metcalf v. Hart.

property which he has held all these years? Is he a trespasser, or is his possession rightful? He is not in possession by contract. Is he lawfully in, by permission of the party who had a right to give it? This brings us to the questions of license and equitable estoppel.

"License" is defined by Abbott to be, in its general sense, permission; consent that a person may do some act which without such consent he might not lawfully do. An authority to do some one act, or series of acts, on the land of another, without possessing any estate in the land. Bouvier's definitions of the term "license" are substantially the same. These definitions, like most short definitions, are incomplete. A license may be to do some act, without going on the land of another, which will interfere with the owner's possession, enjoyment, or control; and a license may result from approval of acts of the licensee after they are done, as well as from permission previously given. Verling K. Hart, by his desert-land entry of June 9, 1879, acquired the right of possession of a tract of land, including that upon which the town of Buffalo was afterwards built. As he told several parties, he could give them no title under that entry. He could, however, waive his possessory right, if he chose to do so, and give them permission to enter upon his "claim," occupy portions of the land, and build there. The question is, did he do it? and, if so, did such permission inure to the benefit of this complainant, and to what extent? The solution of these questions requires an examination of the evidence.

A. J. McCray testifies that he conversed with Hart in March or April, 1881. Said to Hart that he supposed they were building a town on his (Hart's) land, or what would be his land; that a few of them had gone ahead and started a little burgh, not knowing what the future would be, or where a title was to come from. Asked Hart if Snyder was his authorized agent. Hart said Snyder was his authorized agent, and that he would abide by what Snyder did; and that if what few men were there made a little burgh he would do all he could to assist them in improving the property, and that they should have titles at a nominal figure when he was able to convey to them. At this time complainant was not at Buffalo; neither was Burgess. McCray told this to a number of the settlers. He also talked with Hart on the subject in the fall of 1882, and Hart then expressed himself as greatly surprised and pleased at the progress the town had made, and again assured him that the people would have no difficulties in procuring titles as soon as he could convey them. By this time both complainant and Burgess were there, and had erected improvements. John A. Fischer talked with Hart upon the subject repeatedly in 1881 and 1882. Hart told him he would like to see people come to Buffalo and settle, and if he (Fischer) could influence parties or friends on the railroad to come, he would be glad if they would settle there and make a town; that mechanics, blacksmiths, shoemakers, or all good people that would locate there he would give a lot, after the town was laid out properly, for very little expense. In answer to the question whether this was generally known, Fischer says, "Yes, sir; it was known. Most everybody expected the first settlers had their lots for nothing. * * * I think the expenses were attached to recording. The people had to stand that, as I understood from Col. Hart." George W. Munkers, probate judge and treasurer, talked with Hart at Buffalo in the fall of 1882, and asked "the price of ground." Hart declined to give any positive answer, as he had not title, but answered that the "price would be very nominal." Munkers says: "He conveyed the idea to me that the parties first building he was willing to encourage them for a nominal sum for the land." There is no testimony conflicting with this, but other testimony which corroborates it. None of these declarations of Hart's were confidential. They were not personal to the parties to whom they were made. Hart's assurances to McCray were for the men who built a burgh; to Fischer, in favor of mechanics, and all good people who would come and settle there; to Munkers, in favor of those first building. The understanding of Hart with his partner, Snyder, and which was made public, was for the benefit of those who should have buildings in the limits of the town when the survey should be made.

These matters were all made public, and were intended to be made public, and were intended to influence the people generally. They were not confined to people at or near Buffalo at the time. Hart requested Fischer to make them known on the railroad, a great distance away, and influence people to come and settle at Buffalo. E.

Metcalf v. Hart.

U. Snyder, sheriff of the county, and partner and agent of Hart, at and before the location of the town of Buffalo, states the situation fairly and fully. He says: "In the years 1879 and 1880 we were strongly opposed to any one building on this claim, but after we were satisfied there would be a town built, and came to the conclusion to survey and plat the same, it was agreed and understood by us that all parties that had buildings on lots at the time of the survey should have the lots at a small price; the amount I don't think was mentioned." He cannot fix the exact time when this was first made public, but it was talked over about a couple of years before Hart's death, (February 17, 1883,) and made public from that time. It was generally understood. He told a number of persons himself. No plainer invitation to occupy ground and to erect buildings thereon prior to the proposed survey could be made. The intention to include as beneficiaries all who should build prior to the proposed survey could not be made plainer. It was also an approval of the erection of the buildings already there. The declarations of Hart, and the agreement between Hart and his partner and agent, Snyder, in favor of the settlers, were made public, and were intended to reach and influence others besides those to whom the declarations were directly made. The substance of them became known to complainant. He got his information, as he says, from the oldest citizens. He, with them, was content to take his title through Hart, if Hart perfected his title, of which there was some doubt. If he did not, they still had the resource open of proceeding under the town-site law. It became known to complainant that Hart expressed himself as glad to see buildings put up. The public declarations of Hart, and his conduct, were admissions that the settlers were not trespassers; that they were rightfully there with his permission and approval. He did not treat the settlers as trespassers. He made them welcome. He assured them of his good-will, and of his approval of their occupation and improvement of the proposed town-site, and of his assistance in the future. It is not material that he did not talk to each individual personally. His language was general. He talked to a few for all. When he saw the town in the fall of 1882 the improvements of Burgess and part of the improvements of Metcalf were there. Hart did not stop to inquire who the men were

who had built the town, but expressed his gratification with what had been done. Such declarations and conduct come under the head of unsolemn admissions, as classified and defined by Greenleaf: "Those which have been acted upon, or have been made to influence the conduct of others, or to derive some advantage to the party, and which cannot afterwards be denied without a breach of good faith." 2 Greenl. Ev. § 27. Again: "Admissions, whether of law or fact, which have been acted upon by others, are conclusive against the party making them, in all cases between him and the person whose conduct he has thus influenced. It is of no importance whether they were made in express language to the person himself, or implied from the open and general conduct of the party; for in the latter case the implied declaration may be considered as addressed to every one in particular who may have occasion to act upon it. * * * The latter class comprehends not only these declarations, but also that line of conduct, by which the party has induced others to act, or has acquired any advantage to himself." Id. § 207. The conduct of Hart, as well as his language, was an admission that the settlers were rightfully in possession of their improvements, and with his approval and consent. The evidence that the settlers in Buffalo, prior to his death, erected and held possession of their improvements with his knowledge and approval and consent, is abundant and satisfactory. There is no evidence to the contrary. There is nothing to show that he ever revoked this license. A simple license may be revoked by the licensor at any time. It is revoked by his death. It is also revoked by a sale of the realty involved. But in neither case does its revocation undo what has been done under it, or make that unlawful which was lawful when it was done. The license given by Verling K. Hart to occupy and improve the town-site of Buffalo was revoked by his death, which occurred February 17, 1883. Any holdings taken possession of after that time cannot be protected by that license. But any taken before that time may be, if other facts warrant it, and valuable improvements placed upon portions of the land before that time by virtue of such license were placed there lawfully. So far there can be no question. Then, what was the effect of such occupation and improvement under that license?

.Metcalf v. Hart.

The subjects of license and easement have been fruitful sources of litigation. There has been a difficulty recognized in distinguishing between the two. "An easement," says Mr. Angell in his able treatise on Water-Courses, (page 316,) "it has appeared, is a liberty, privilege, or advantage in land, without profit, and existing distinct from the ownership of the soil; and it has appeared, also, that claim for an easement must be founded upon a deed or writing, or upon prescription which supposes one. * * * A license, on the other hand, is a bare authority to do a certain act, or series of acts, upon another's land, without possessing any estate therein; and, it being founded in personal confidence, it is not assignable, and it is gone if the owner of the land who gives the license transfers his title to another, or if either party die." This definition of a license, as well as of an easement, is adopted by Chancellor Kent, (3 Kent, Comm. 452,) and is expressly recognized by the most approved English and American authorities. Thompson v. Gregory, 4 Johns. 81; Mumford v. Whitney, 15 Wend. 380; Cook v. Stearns, 11 Mass. 533; Miller v. Railroad Co., 6 Hill, 61; Fitch v. Seymour, 9 Metc. (Mass.) 462; Hays v. Richardson, 1 Gill & J. 366; Fentiman v. Smith, 4 East, 109; Hewlins v. Shippam, 5 Barn. & C. 221; Thomas v. Sorrell, Vaughan, 351; Wood v. Leadbitter, 13 Mees. & W. 843. While it has been uniformly held that a parol license, while it remains executory, may be revoked at pleasure, (Cook v. Stearns, 11 Mass. 533; Mumford v. Whitney, 15 Wend. 380; Fentiman v. Smith, 4 East, 109; Ang. Water-Courses, 319, 324,) yet when executed, whether it is revocable, and if so how far and to what extent, has been a question fraught with much difficulty, and respecting which different courts of the highest respectability have held very differently. Hazelton v. Putnam, 3 Pin. 108.

The first part of this definition applies to a mere naked license, without consideration. Such a one has been considered as founded on personal confidence, and not assignable, and revocable at the will of the licensor. But the cases are numerous of licenses founded upon valuable consideration where the motive of personal confidence, if it existed at all, is a very subordinate one. The material question is whether permission to go upon the land of the licensor, and do any act or series of acts there, was actually given, either expressly or by implication. In this case we have seen that such permission was given, and that the occupation and improvement of the property was ratified by the language and conduct of Hart, the licensor, after considerable expenditures had been made by the licensees, Metcalf and Burgess. As already stated, the general doctrine of the common law has always been, and is now, that a simple parol license is revocable at the will of the licensor, and is revoked, *ipso facto*, by the transfer of the realty by the licensor, or by his death, or by an assignment of the license. The conflict of authority already mentioned is principally among the common-law courts. Courts of chancery have not developed nearly so much conflict. But even the law courts hold with much unanimity that a license by parol, as well as written, when coupled with an interest, becomes irrevocable, except in cases where such irrevocability would conflict with some other rule or principle or policy of the law. In such cases there is a conflict of opinion in courts of the highest respectability as to which rule should give way. The rule under consideration is laid down by the supreme court of the United States, opinion by Chief Justice MARSHALL, in Hunt v. Rousmanier's Adm'rs, 8 Wheat., at page 203: "This general rule that a power ceases with the life of the person giving it admits of one exception. If a power be coupled with an interest, it survives the person giving it, and may be executed after his death." And, similarly, a license coupled with an interest is not revocable by a conveyance of the realty to which it relates. This appears from Hunt v. Rousmanier's Adm'rs, supra, and there is no conflict of authority upon that point, except as stated above, where some other rule or principle intervenes, such as the statute of frauds. It should be remembered that a license is a power. The difference between a simple license and a license coupled with an interest is clearly set forth and illustrated by Chief Justice VAUGHAN in Thomas v. Sorrell, Vaughan, 350, in the following language, which has been extensively quoted, and always with approval: "A dispensation, or license, properly passeth no interest, nor alters or transfers property in anything, but only makes an action lawful which without it had been unlawful. As a license to go beyond the seas, to hunt in a man's park, to come into his house, are only actions which without license had been unlawful. But a license

Metcalf v. Hart.

to hunt in a man's park, and carry away the deer killed to his own use; to cut down a tree in a man's ground and to carry it away the next day after, to his own use, —are licenses as to the acts of hunting and cutting down the tree, but as to the carrying away of the deer killed and the tree cut down they are grants." And Baron ALDERSON in Wood v. Leadbitter, 13 Mees. & W. 843, says that "a license by A. to hunt in his park was revocable, whether given by deed or parol, and merely renders the act of hunting lawful, which, without the license, would have been unlawful. But if the license, as in the case put by Chief Justice VAUGHAN, was a license not only to hunt, but to take away the deer, when killed, as the property or to the use of the licensee, 'hen, if the grant of the deer was good, the license would be irrevocable, because the person who gave it would be estopped from defeating his own grant." A common case of this nature in America is that of a parol license to cut and carry away timber. When, in pursuance of the license the timber has been cut, the license cannot be revoked so as to prevent the licensee from carrying it away, or to enable the licensor to maintain trespass against the licensee for going upon his premises for that purpose, or to enable the licensor to maintain trover for the timber; and one who sells goods which are upon his land, or brings the goods of another upon his land, or permits the owner to do so, gives the latter an implied authority to enter for the purpose of taking the goods away, which the licensor cannot recall. The license is supported by the interest with which it is coupled. These are all instances of a license to do particular acts upon the realty of another, not involving any permanent occupation of the land, or the exercise of any permanent or continuous control over it, amounting to an easement or an estate in it.

But instead of oral permission to leave goods on the land of another for safe-keeping or other purpose, and to enter upon the land, it may be repeatedly, to take them away, suppose oral permission is given to build a house there, and to enter at will upon the land, and hold it for the purpose of occupying, using, and enjoying the house, without limit as to time. This is the creation of a permanent interest or estate in or upon the land, which, by the common law and the statute of frauds, cannot be created without writing. It is not doubted that such a parol license would be

valid, and would be sufficient authority to justify the party acting upon it in building the house and occupying the premises so long as the license remains in force. There is no difference of judicial opinion upon this point. "License" is defined to be a power or authority, and so long as the license is not countermanded, the licensee is acting in the licensor's own right, and in his stead. *Qui facit per alium facit per se.* The point of divergence in the authorities is the question whether such licenses, when executed in whole or in part, and at considerable expense incurred on the faith of the license, are revocable at common law; whether they are revocable at the will of the licensor, notwithstanding the consequent loss of the licensee of expenditures made in good faith, and whether they are, *ipso facto*, revoked by the death of the licensor, or by the transfer of the property by him, or by the transfer by the licensee of his interest.

The early English cases of Tayler v. Waters, 7 Taunt. 374, and Wood v. Lake, Sayer, 3, held such licenses irrevocable. But these cases were overruled in the later cases of Hewlins v. Shippam, 5 Barn. & C. 221, and Wood v. Leadbitter, 13 Mees. & W. 837; and since the latter case it has been the doctrine of the English law courts that an oral license to enter upon realty and make improvements cannot be made to operate as a valid grant of a permanent interest or estate or easement in the realty, although executed, in whole or in part, by the licensee, and even at great expense. This doctrine of the English law courts has been quite extensively adopted in the United States. The case of Cook v. Stearns, 11 Mass. 533, decided in 1814, has become a leading case in this country. It is an action of trespass *quare clausum fregit*, and adopts the English rule strictly. Massachusetts having no chancery courts, it might have been expected that there, as in Pennsylvania, the law courts would undertake to administer equitable relief under the common-law forms; but it seems that such was not the case. The case was tried simply as an ordinary action at law, without an intimation, either in the opinion of the court or the briefs of counsel, that any equities could possibly be considered. The case of Mumford v. Whitney, 15 Wend. 381, decided in 1836, also strictly follows the common-law rule. It was an action on the case at law, and there seems to be no reason apparent why it should not follow the common-law

Metcalf v. Hart.

rule. Other cases sustaining the proposition that a parol license, although executed, cannot operate as a grant of an interest in real estate, are Ruggles v. Lesure, 4 Pick. 187; Stevens v. Stevens, 11 Metc. (Mass.) 251; Foot v. Railroad Co., 23 Conn. 214; Bridges v. Purcell, 1 Dev. & B. 492; Miller v. Railroad Co., 6 Hill, 61; Carter v. Harlan, 6 Md. 20; Carleton v. Redington, 1 Fost. (N. H.) 291; Seidensparger v. Spear, 17 Me. 123; Thompson v. Gregory, 4 Johns. 81; Simpkins v. Rogers, 15 Ill. 397; Woodward v. Seely, 11 Ill. 157; Kamphouse v. Gaffner, 73 Ill. 461; Tanner v. Volentine, 75 Ill. 628.

But the decisions of the law courts have not been at all uniform upon this question. Some of them have applied the doctrine of equitable estoppel when necessary to prevent fraud, and have not allowed the license to be revoked. But probably the weight of authority is with Cook v. Stearns. But the case at bar is a suit in equity, and the question is not what is the legal doctrine, but what is the equitable doctrine. And every authority in favor of applying the doctrine of equitable estoppel in a law court applies *a fortiori* in a court of equity. But the refusal of a court of law to apply such doctrine is no authority against applying it in equity. In a number of cases at law involving the question under consideration, courts and judges, recognizing the harshness of the established legal rule, have suggested that equity might furnish relief. See Den v. Baldwin, 21 N. J. Law, 390; Foot v. Railroad Co., 23 Conn. 214; Bridges v. Purcell, 1 Dev. & B. 492; Prince v. Case, 10 Conn. 375; Benedict v. Benedict, 5 Day, 469; Foster v. Browning, 4 R. I. 47. The following note to Hall v. Chaffee, 13 Vt. 157, by Judge ISAAC F. REDFIELD, is suggestive. He says: "I have no doubt many cases, both English and American, may be found, and those of high authority, which either directly or indirectly recognize the doctrine that a parol license to enjoy an easement growing out of land, when once executed, becomes irrevocable, and the right thus acquired permanent. [Authorities cited.] But I apprehend the just weight of authority, both English and American, in regard to the rights of the parties at law, is that such license is within the statute of frauds, and, unless in writing, countermandable at will, even when executed so as to make any further enjoyment of the easement a ground of action. If such a license be given by parol and ex-

pense incurred upon the faith of it, so that the parties cannot now be placed *in statu quo*, there would seem to be the same reason why a court of equity should grant relief, as in any other case of part performance of a parol contract for the sale of land or any interest therein, *i. e.*, to prevent fraud."

But, as already intimated, the law courts have not, by any means, in all instances, or even very generally, contented themselves with referring parties to the equity tribunals for relief in cases involving a breach of faith on the part of the licensor, and consequent irreparable damage to the licensee. A number of our American law courts have seized upon and adopted the doctrine of equitable estoppel, by which they have been enabled to administer relief indirectly in cases which otherwise would not lie within the scope of their powers. Ricker v. Kelly, 1 Me. 117; Clement v. Durgin, 5 Me. 9; Ameriscoggin Bridge v. Bragg, 11 N. H. 102; Woodbury v. Parshley, 7 N. H. 237; Sheffield v. Collier, 3 Ga. 82; Wilson v. Chalfant, 15 Ohio, 247; Snowden v. Wilas, 19 Ind. 10. And, where the law courts have not gone so far as to adopt the doctrine of equitable estoppel in such cases, they have very generally established the doctrine that buildings may, by permission of the owners of the soil, be erected thereon without becoming part of the inheritance; and that the person erecting them, when excluded from their possession and use, should have some remedy, that he should not lose the product of his labor entirely. "The existence of a right of property in a building, apart from the title to the soil, necessarily involves the conclusion that the person in whom it is vested may remove the building if he is obliged to surrender possession of the land. It has consequently been decided that a house or shop erected on the land of another under a license which is subsequently withdrawn may be removed by the person who put it up, (Doty v. Gorham, 5 Pick. 487; Wells v. Banister, 4 Mass. 514; Fuller v. Tabor, 39 Me. 519;) or its value recovered in trover, if the owner of the soil forbids or prevents its removal, (Russell v. Richards, 10 Me. 429, 11 Me. 371; Osgood v. Howard, 6 Greenl. 452.)"

But the true field for the administration of justice in such cases is in equity. We have already given the *dictum* of Judge REDFIELD upon the subject under consideration, which he put in a note to Hall v. Chaffee, supra, an action at law. That

Metcalf v. Hart.

eminent jurist afterwards had occasion to set forth his views of the equitable doctrine in such case in an opinion where they are not *dicta*. The case of Pope v. Henry, 24 Vt. 560, decided in 1852, was a suit in chancery. Judge REDFIELD delivered the opinion of the court. His remarks upon the interest or title of the defendant Henry explain themselves. They are as follows: " Without saying more in regard to the title of the plaintiff, we proceed to the examination of the title of the several defendants, each of which stands upon peculiar grounds. In regard to that of defendant Henry, it originated in a mere license to take water, by some kind of a duct, sufficient to carry certain machinery, which, in faith of the license, he subsequently erected, and had continued to occupy as his own for more than fifteen years before the bringing of the bill. This we think gives him an equity against all the world to be reimbursed for the value of his whole erections by the person taking them before he could be deprived of them. It is one of the first principles of the Roman civil law in regard to real estate, and valuable erections and ' meliorations,' as they are called, put thereon by the occupier in faith of a title which subsequently failed for any cause, that one thus benefited by the labor of another should make reasonable compensation. And the same principle has been very early incorporated into the English chancery law. This right clearly exists in Henry, without regard to his ultimate title. * * * Possession taken under a license to occupy permanently, either absolutely or under certain conditions, gives, in equity, a title to the premises, according to the terms of the license. And, this contract being partly performed or fully performed on one part by permanent erections of considerable value, a court of equity will decree an assurance of the title stipulated. And the party being in possession under the license is notice to a subsequent purchaser or incumbrancer of whatever title the one in possession may have, whether legal or equitable." So different is the language of equity from that of the law when expressed by the same courts and the same judges.

In the state of New York the case of Mumford v. Whitney, supra, speaks the language of her law courts. The following very complete and accurate syllabus of a suit in chancery gives, in brief, the language of her courts of equity. "Bill for specific performance of an agreement to sell

or lease land. The appellants had entered upon the land under an assignment of a license given by the respondent to occupy and improve the land. They afterwards surrendered that license to the respondent, who gave them a written memorandum authorizing them to possess the land, and promising to give them the preference to purchase or lease the land. It was proved that at various times the respondent had encouraged the appellants to improve and build on the land, by assurances that no advantage should be taken of their labor, and that when his title was perfected, by a partition of the land, they should have a lease in fee, or a deed at the rate wild lands were selling. The respondent in his answer denied any other agreement than the memorandum, and relied on the statute of frauds. It was held that, the appellants having gone on the land and made improvements, this was a part performance, and took the case out of the statute; that, although the memorandum was itself uncertain, yet, as a part performance was made the basis of the claim to a specific execution of the agreement, parol evidence might be connected with the memorandum for the purpose of making out the contract; and, there being satisfactory evidence of an agreement, independently of the memorandum, and the conduct of the respondent being a fraud on the appellants, a specific performance was decreed." Parkhurst v. Van Cortlandt, 14 Johns. 15.

It is said that the fact that a promise has been made and never performed is not evidence of fraud, but the rule has its exceptions. Judge Cooley says: "If deceit, in order to be actionable, must relate to existing or past facts, it is evident that the fact that a promise made in the course of negotiations is never performed is not, of itself, either a fraud or the evidence of a fraud. Nevertheless, a promise is sometimes the very device resorted to for the purpose of accomplishing the fraud, and the most apt and effectual means to that end. Such is the case already mentioned, of the purchase of goods with the intention not to pay for them. It is the fraudulent promise that accomplished the wrong. So, if one promises to take up incumbrances on the title of another, and by means of the promise throws the promisee off his guard while he secures the title for himself, it would be a singular defense for him to make that he had only failed to perform his promise. The promise was

Metcalf v. Hart,

merely his false token, by means of which he effected his cheat. So, if the beneficiary in a will, when the maker thereof is on his death-bed, say to him he need not trouble himself, for he, the beneficiary, will make conveyance according to the wishes expressed, he may be held to this promise as a fraud, if he did not intend to perform it." Cooley, Torts, 487. The opinion in the case last cited quotes approvingly from an old but valuable work on frauds some descriptions of fraud which have always been recognized as correct and never better stated by more recent authorities. The quotations are from Roberts on Frauds. "The relief," says he, (page 13,) "against the statute [of frauds] in these cases of part performance was originally founded on the fraud and deceit usually characterizing the circumstances. There is no satisfactory foundation for the doctrine of part performance without the intermixture of fraud; (page 132,) and upon this ground, where an owner of lands has encouraged another to go on with his improvements upon the estate under a false expectation of a conveyance or a lease, and this expectation is raised in him by the assurance of such owner, it is agreeable to the general course of equitable relief to disappoint the contrivance by compelling the deceiver to realize the expectation he has created, that is, by compelling him to give such deed or lease. This protecting jurisdiction," he says, "has stretched itself to those cases where the illusory hope has been raised, not only by words and assurances, but simply by looking on in silence, whilst false impressions, which we are able either to correct or verify, are inducing a fruitless expenditure on improvements. This equity is strong and salutary, and the jealousy of jurisdiction has shut out the statute of frauds where this principle of relief applies." Again, he says, (page 134:) "These instances of encouragement, either tacit or express, to make improvements and incur expenses, etc., are not proper cases of part performance, but of actual fraud, which courts of equity have always been forward to relieve against." The meaning seems clear that the fraud was not in making to appellants the promise to sell them the land or lease it to them, nor in the failure to perform simply. All this might have occurred without fraud if the parties could have been placed *in statu quo*. The fraud consisted in inducing appellants, by means of such promise, to go upon the land, and invest their labor and money there, and then robbing them of the resulting benefits by revoking their license to remain there in the homes they had built there lawfully, and which were their own. Even the law courts in a number of cases recognize the title of the occupants to the improvements in such cases, and their right to remove them or to be paid for them.

We do not overlook the fact that a labored argument has been made in the case at bar against the doctrine that part performance of a parol contract for the sale of real estate takes it out of the operation of the statute of frauds. Especial force is laid upon the words of our statute declaring such contracts void. We had supposed this not to be an open question. We will not attempt to review the authorities upon the question. This has been done too often by our ablest jurists. But in recognition of the elaborate argument of counsel we will give the conclusions arrived at by two of our American commentators, whose works are standard authorities in all our courts. We quote first from Story, Eq. Jur.: "Sec. 759. In the next place, courts of equity will enforce specific performance of a contract where the parol agreement has been partly carried into execution." "Sec. 761. But a more general ground, and that which ought to be the governing rule in cases of this sort, is that nothing is to be considered a part performance which does not put the party in a situation which is a fraud upon him unless the agreement is fully performed. Thus, for instance, if upon a parol agreement a man is admitted into possession, he is made a trespasser, and is liable to answer as a trespasser if there be no agreement valid in law or equity. Now, for the purpose of defending himself against a charge as a trespasser and a suit to account for the profits in such a case, the evidence of a parol agreement would seem to be admissible for his protection; and, if admissible for such a purpose, there seems to be no reason why it should not be admissible throughout. A case still more cogent might be put where a vendee, upon a parol agreement for a sale of land, should proceed to build a house on the land in the confidence of a due completion of the contract. In such case there would be a manifest fraud upon the party in permitting the vendor to escape from a due and strict fulfillment of such agreement. Such a case is certainly distinguishable from

that of a part payment of the purchase money, for the latter may be repaid, and the parties are then just where they were before, especially if the money is repaid with interest. A man who has parted with his money is not in the situation of a man against whom an action may be brought, and who may otherwise suffer an irreparable injury." And from Pom. Eq. Jur.: "Sec. 140. The doctrine was settled at an early day in England, and has been adopted in nearly all the American states, that a verbal contract for the sale and leasing of land, or for a settlement made in consideration of marriage, if part performed by the party seeking the remedy, may be specifically enforced by courts of equity, notwithstanding the statute of frauds. The ground upon which the remedy in such cases rests is that of equitable fraud. It would be a virtual fraud for the defendant, after permitting the acts of performance, to interpose the statute as a bar to the plaintiff's remedial right." And in section 103 we find the following language: "Under the prohibition of the statute of frauds a contract for the sale of land, when not in writing, cannot be enforced in law, even though part performed. It makes no difference whether the statute says, as in England and in some of the states, that no action can be maintained on such an agreement, or says that the agreement is void; the result is practically the same in either form of the statute. The verbal contract is no contract in law, but is simply a nullity. Equity speaks a very different language. It says that such a verbal contract, if part performed in a proper manner, shall be enforced."

It is sufficiently apparent, without rehearsing what has gone before or citing additional authorities, that the ground upon which equity exempts a partly executed parol contract for the sale of realty from the operation of the statute of frauds, and decrees the execution of the contract, is simply fraud. It is said the object of the statute is to prevent fraud, and equity will not allow it to be made the instrument of fraud. When so understood and limited, the rule is a salutary one. Story says, in the case of a vendee of land by parol building a house upon it in faith of the completion of the contract, there would be manifest fraud in permitting the vendor to escape from a due and strict fulfillment of the agreement. Pomeroy says it would be a virtual fraud for the defendant, after permitting the acts of performance, to interpose the statute as a bar to the plaintiff's remedial rights. But suppose the owner of the land, without going so far as to make a complete contract, specific in all its material terms, so as to be capable of definite proof and of enforcement, should stop short of that, but should by other inducements influence persons to invest money and labor on his lands, with a positive assurance that their possession should not be interfered with, and that they should eventually receive titles covering their improvements, and that he should stand by and permit and continue to encourage these investments in execution of the permission he had given them to erect improvements and make their homes upon his land. If he should then revoke their license, bring ejectment to expel them from the homes they had built, and interpose the statute of frauds in bar of all relief to them, would his conduct be less a fraud in this case than in the other? The Pennsylvania courts say it would be the same, and that a mere license for the occupation or use of real estate will entitle the persons who have incurred considerable expense in execution of such license to relief in equity as fairly and fully as part performance of a parol contract for the sale of real estate entitles the vendees to such relief. The case of Rerick v. Kern, 14 Serg. & R. 267, decided in 1826, citing and approving the prior case of Le Fevre v. Le Fevre, 4 Serg. & R. 241, goes to the full extent of declaring such executed license an agreement on valuable consideration. It should be observed that Pennsylvania had no chancery courts, but administered equitable relief in the common-law actions, and through the common-law forms. Rerick v. Kern was an action on the case for diverting water from a stream, thereby injuring plaintiff's mill. The water had been taken from its natural channel, and turned into this stream leading to plaintiff's mill by a structure erected on land of defendant under a license from him. He afterwards removed this structure, so as to allow the water to return to its old channel. Plaintiff had erected a mill on the faith of the authority to so divert and use this water, and the loss of it would render his mill unserviceable during a considerable portion of the year. Plaintiff contended that under these circumstances the license was irrevocable. Defendant contended that a mere license is revocable

Metcalf v. Hart.

under all circumstances and at any time. The court says: "But a license may become an agreement on valuable consideration,—as, where the enjoyment of it must necessarily be preceded by the expenditure of money; and when the grantee has made improvements or invested capital in consequence of it he has become a purchaser for a valuable consideration. Such a grant is a direct encouragement to expend money, and it would be against all conscience to annul it as soon as the benefit expected from the expenditure is beginning to be perceived. Why should not such an agreement be decreed *in specie?* That a party should be let off from his contract on payment of a compensation in damages is consistent with no system of morals but that of the common law, which was in this respect originally *determined by political considerations,* the policy of its military tenures requiring that the services to be rendered by the tenant to his feudal superior should not be prevented by want of personal independence. Hence the judgment of a court of law operates on the right of a party, and the decree of a court of equity on the person. But the reason of this distinction has long ceased, and equity will execute agreements for the breach of which damages may be recovered, where an action for damages would be an inadequate remedy. How very inadequate it would be in a case like this is perceived by considering that a license which has been followed by an expenditure of ten thousand dollars as a necessary qualification to the enjoyment of it may be revoked by an obstinate man, not worth as many cents. But, besides the risk of insolvency, the law, in barely compensating the want of performance, subjects the party to risk from the ignorance or dishonesty of those who are to estimate the quantum of the compensation. In the case under consideration no objection to a specific performance can be founded on the intrinsic nature of the agreement, nor, having been partly executed, on the circumstance of its resting in parol; but it is to be considered as if there had been a formal conveyance of the right, and nothing remains but to determine its duration and extent. A right under a license, when not specially restricted, is commensurate with the thing of which the license is an accessory. Permission to use water for a mill, or anything else that was viewed by the parties as a permanent erection, will be of unlim-

ited duration, and survive the erection itself if it should be destroyed, or fall into a state of dilapidation, in which case the parties might, perhaps, be thought to be remitted to their former rights. But, having had in view an unlimited enjoyment of the privilege, the grantee has purchased, by the expenditure of money, a right indefinite in point of duration, which cannot be forfeited by non-user, unless for a period sufficient to raise the presumption of a release. The right to rebuild in case of destruction or dilapidation, and to continue the business on its original footing, may have been in view as necessary to his safety, and may have been an inducement to the particular investment in the first instance. The cost of building a furnace, for instance, would be trivial when weighed with the loss that would be caused by breaking up the business and turning the capital into other channels; and, therefore, a license to use water for a furnace would endure forever. But it is otherwise where the object to be accomplished is temporary. Such, usually, is the object to be accomplished by a sawmill, the permanency of which is dependent on a variety of circumstances, such as an abundance of timber, on the failure of which the business is necessarily at an end. But till then it constitutes a right for the violation of which redress might be had by action. With this qualification it may safely be affirmed that expending money or labor in consequence of a license to divert a water-course or use a water-power in a particular way has the effect of turning such license into an agreement that will be executed in equity." If this be correct, of course a license for any other purpose extending to the permanent use or occupation of realty, and upon which money had been expended, would have a similar effect, according to the nature and terms of the license.

We have quoted at considerable length from the above case, because it discusses and decides so many important points so briefly and so clearly, obviating the necessity of a restatement of the points decided or of the doctrine of the case. It is well to observe, however, that the case is not a suit for specific performance, but an action on the case for damages. The license to divert the water on the land of defendant, and to maintain a structure there for the purpose, followed by large expenditure on the faith of such license, is declared to be an agreement on valuable

consideration, and to be considered as if there had been a formal conveyance of the right,—*i. e.*, a conveyance by deed. Underlying all is the idea of the important interests involved and depending upon the validity and irrevocability of the license. This is a leading case. It has been followed in Pennsylvania, and, to a considerable extent, in other states. See Swartz v. Swartz, 4 Pa. St. 358; Wheatley v. Chrisman, 24 Pa. St. 298; Huff v. McCauley, 53 Pa. St. 206; Dark v. Johnson, 55 Pa. St. 164; Thompson v. McElarney, 82 Pa. St. 174; Railroad Co. v. McLanahan, 59 Pa. St. 30. And this last case declares a subsequent ratification by parol equivalent to a precedent authority. The New York doctrine at law is sufficiently indicated in the case of Mumford v. Whitney, and in equity by Parkhurst v. Van Cortlandt, already referred to. So, in Vermont, by the cases of Hall v. Chaffee, and Pope v. Henry, supra. It seems that Massachusetts has adhered to the doctrine of Cook v. Stearns. New Hampshire and Maine seemed inclined to the Pennsylvania view at first. See Ameriscoggin Bridge v. Bragg, 11 N. H. 102; Woodbury v. Parshley, 7 N. H. 237; Sheffield v. Collier, 3 Ga. 82; Ricker v. Kelly, 1 Me. 117; Clement v. Durgin, 5 Me. 9. But afterwards they both wavered, holding that, while the license might be valid as between the original parties, it would not be. as between their vendees or successors in interest. See Carleton v. Redington, 1 Fost. (N. H.) 291, and Seidensparger v. Spear, 17 Me. 123. In discussing the question of parol licenses the supreme court of Ohio uses the following language, after referring to the differing decisions of neighboring states: " But in Ohio we think it can at this day be hardly considered as an open question. Partly performed parol contracts, especially when the non-execution would operate as a fraud on the rights of the vendee, have repeatedly been enforced in equity, and a parol license executed has been held to be irrevocable in numerous instances on the circuit at law." Wilson v. Chalfant, 15 Ohio, 248. See, also, Hornback v. Railroad Co., 20 Ohio St. 81. Indiana coincides substantially with Pennsylvania. Her supreme court says: " But though a parol license amounting in terms to an easement is revocable as to future enjoyment at law, and is determined by a conveyance of the estate upon which it was to be enjoyed, this is not the rule in all cases in courts of equity. In these courts the future enjoyment of an executed parol license, granted upon consideration, or upon the faith of which money has been expended, will be enforced at all events where adequate compensation in damages could not be obtained. This will be done on the two grounds of estoppel on account of fraud, and specific performance of a partly executed contract to prevent fraud. And in those states of the Union where law and equity are administered in the same court, relief is afforded in any given suit where the pleadings present the necessary averments; and grantees as well as the original parties are bound where they purchase with notice; and in a mill and dam the existing condition of things might be notice to them of the equity." Snowden v. Wilas, 19 Ind. 10, cited and approved in Lane v. Miller, 27 Ind. 534, and Simons v. Morehouse, 88 Ind. 391. In Iowa the doctrine is well established that an executed parol license for the occupation of real estate cannot be revoked either by the licensor or his grantee with notice; at least not without compensation. Bush v. Sullivan, 3 G. Greene, 344; Beatty v. Gregory, 17 Iowa, 109; Anderson v. Simpson, 21 Iowa, 399; Harkness v. Burton, 39 Iowa, 101, Wickersham v. Orr, 9 Iowa, 253. In Illinois the decisions are contradictory and unsatisfactory. In Russell v. Hubbard, 59 Ill. 335, it was held in the strongest terms that an executed license, where the parties could not be placed *in statu quo*, was irrevocable; that the revocation in such a case would be a fraud, and compensation for damages no adequate redress. This case was decided in September, 1871. It was an action at law, involving an executed parol license to use a party-wall. Three years after, in the case of Kamphouse v. Gaffner, the court held that this case must be considered as overruled or limited to cases of party-walls. The court says further: " On mature consideration we are unwilling to announce the doctrine that, notwithstanding the prohibition of our statute of frauds to the contrary, an interest in land which cannot be terminated by revocation may be acquired by parol license, which a court of law will recognize and protect. We still preserve the distinction between law and equity, however; and to what extent a court of equity might enforce specific performance, or grant relief on account of the peculiar hardship resulting from a revocation by a licensor, is another question, and one that we can-

Metcalf v. Hart.

not now properly consider." The cases referred to as having been decided by the supreme court of Iowa in some respects are commendable "for the equitable view they take of the question; but when applied to a court in which the distinction between law and equity are preserved, they are contrary to the current of authority, and we do not feel at liberty to follow the rule they indicate." The case is an action at law, but reference is made in the opinion to the case of Woodward v. Seely, 11 Ill. 157, a chancery case, which announces the same doctrine. The latter case, however, refers for authority to law cases exclusively. This patent absurdity destroys its weight as an authority in equity.

It is said that equity follows the law, which is true. But equity has a scope of its own for giving relief, especially against actual or constructive fraud, which the law cannot give; otherwise there would be no such thing as equity jurisdiction distinct from the law. When the law says that a parol contract for the sale of land conveys no estate under the statute of frauds, equity does not deny it; but when, by virtue of such contract, the vendee has been put in possession of the land, induced to make valuable improvements thereon, of which he would be defrauded and robbed by excluding him from the possession, and where a judgment for damages would not afford adequate relief, equity steps in and says the vendor shall not accomplish this fraud by enforcing his legal title at law in ejectment, but that he shall make a deed of the land, conveying an estate in accordance with the terms of the parol contract. When the law says that a parol license cannot give the licensee a permanent interest, easement, or estate in land, equity will not deny it; but when by virtue of such license the licensee has been put in possession, and induced to put valuable improvements on the land, of which he would be defrauded and robbed by a revocation of the license and ejectment by the holder of the legal title, equity will interpose, and either forbid the licensor to revoke the license, or impose such terms as will avoid the fraud, and accomplish what justice and good conscience demand. The supreme court of Wisconsin states the doctrine in this way: "Most of the American courts have been satisfied with determining that a party who has induced the incorporation of the property of another with his own, through the means of a promise not to interfere with its use or enjoyment by the latter, shall not be allowed to commit the fraud of appropriating it to his own purpose, although he may withdraw the right to use it in the manner originally contemplated, and compel the other party to resort for redress to an action." And, again: "In cases, however, where money has been expended, or improvements made and buildings erected on the faith of a parol license, which has been thus executed, courts of equity have generally interposed, at all events, so far as to restrain the licensor from appropriating to his own use and benefit the labor expended and improvements made on the faith of such license, without placing the licensee in the same situation in which he stood before he entered upon its execution." Hazelton v. Putnam, 3 Pin. 107. "There is no rule more necessary to enforce good faith than that which compels a person to abstain from enforcing claims which he has induced others to suppose he would not rely on. The rule does not rest upon the assumption that he has obtained any personal gain or advantage, but on the fact that he has induced another to act in such a manner that he will be seriously prejudiced if he be allowed to fail in carrying out what he has encouraged them to expect." Faxton v. Faxon, 28 Mich. 159; Harkness v. Toulmin, 25 Mich. 80; Truesdail v. Ward, 24 Mich. 117. "If a party having a right stands by and sees another dealing with the property in a manner inconsistent with that right, and makes no objection while the act is in progress, he cannot afterwards complain." Leeds v. Amherst, 2 Phil. Ch. 123, cited in Faxton v. Faxon, supra. "The same ideas are enunciated in various forms by many authorities, both English and American; among others see Gregg v. Von Phul, 1 Wall. 274; Swan v. Seamens, 9 Wall. 254; Skinner v. Dayton, 19 Johns. 513–561; Raw v. Pote, 2 Vern. 239; Thompson v. Blanchard, 4 N. Y. 303; Parrott v. Palmer, 3 Mylne & K. 632,"—cited in Faxton v. Faxon, supra. In Rhode Island it is held that an executed parol license will not be held irrevocable in a court of law, but that equity will give appropriate relief. Foster v. Browning, 4 R. I. 53. Georgia holds that a parol license to enjoy an interest in lands is void at law, but where large investments have been made on the faith of the license for the enjoyment of the interest, equity will decree specific perform-

ance of the terms of the license as in case of a parol contract for the sale of lands; and where a defendant might, by going into equity, defeat an action at law, he may set up his equitable defense at law. Cook v. Pridgen, 45 Ga. 331. But we will not quote further from the cases upon this point. Enough has been given to show that they are not harmonious, but that the conflict is principally in the courts of law. Enough has been given to show also the trend of the different lines of judicial thought and decision upon the questions involved. How can we reconcile the cases? Can they be reconciled? If we adopt the rule that a parol license to permanently occupy, use, and enjoy realty, when executed in whole or in part at considerable expense, becomes irrevocable and transmissible, and say that this rule is supported by a large number of respectable authorities, we are at once met with the indisputable proposition that it is denied by a large number of respectable authorities. It seems that this conflict may result from drawing general rules from particular cases. Two cases may be in direct conflict upon the general proposition, and yet each be right as applied to its own particular facts. A parol license may be irrevocable in one case and revocable in another, according to the varying facts and circumstances of the two cases.

There is one proposition in regard to which there is no conflict. All authorities —case law and text-book law— agree that it is the proper province of equity to give relief in case of fraud, whether the fraud be actual or constructive, intentional or non-intentional. It would be rash to attempt to give a perfect definition of fraud. Many eminent jurists have attempted it. None have succeeded. The best definitions given admit of so many exceptions as to greatly impair their usefulness in judicial discussion. The only safe way seems to be to define, or rather describe, the fraud suspected to exist in any given case, by comparison with similar cases selected from the Reports. Of all the attempted definitions to be found it seems that none are more satisfactory or instructive than merely to say that fraud is unfair dealing; and when, through inducements held out by one person, even only by means of a promise, by which another person is influenced to change his position so that he cannot be placed in statu quo, and will be seriously damaged unless the promise is fulfilled, then the re-

fusal to perform is fraud. Any transaction that outrages our sense of justice or shocks the conscience of an honest man may well be viewed with suspicion, and scrutinized closely. It seems clear in the case of Parkhurst v. Van Cortlandt, supra, that the court was right in pronouncing the conduct of the defendant a fraud upon plaintiffs. Defendant had given permission to plaintiffs to go on his wild land,— to "possess" it,—and promised them that as soon as he could perfect his own title he would secure them in the permanent occupation of the land by a sale to them, or a permanent lease. He thus induced them to expend money and labor and make homes there. He afterwards attempted to revoke their license, repudiated his promise, and brought ejectment against them on his legal title. Plaintiffs then brought their bill in chancery for an injunction and for specific performance. The case is very similar to the case at bar. The court was right in exercising its equity powers and taking jurisdiction on the ground of fraud. The defendant had simply enticed plaintiffs onto his ground, and entrapped them there with the tempting bait of a favorable location to build homes on easy terms, and was endeavoring to shear them like sheep, and drive them off with his writ of ejectment. It was unconscionable that his scheme should be allowed to succeed. It made it no better that he relied upon his legal title, and appealed to the rigid rules of the common law and her courts to aid him. To grant such aid would have been to outrage justice in her temple through the instrumentality of her own chosen ministers. In fact, it was admitted on all hands that it was a proper subject for the interposition of equity. The only contention was whether the relief should be compensation or specific performance. A majority of the court decided in favor of specific performance. Russell v. Hubbard, 59 Ill. 335, was a case of a party-wall. One Harman owned the wall, and it was built to the north line of his lot. One Furry was about to build a frame house on the adjoining lot. Harman induced him to build of brick, giving him the use of the north wall of his (Harman's) house as the south wall of his (Furry's) house on condition that he would build a brick building. He did so. The court says: "By virtue of this agreement and the erection of the building equitable rights were acquired. Though the license to use the wall might

Metcalf v. Hart.

be revoked prior to its execution, after execution a different question arises, and the possession was constructive notice to the purchaser of the rights which had been acquired. Money had been expended upon the faith of the license, and a different and more expensive building erected. While, ordinarily, it may be true that a parol license of this character is not transmissible, may be revoked at pleasure, and extinguished by the alienation of the land, yet, where money or labor has been expended, the law will interpose to protect the licensee. The revocation, under such circumstances, would be fraudulent, and compensation in damages would afford no adequate redress. In such case the execution of the parol permission would supply the place of a writing, and take the case out of the statute of frauds. It would be the boldest fraud to allow this permission to be revoked. The grantee of Harman was chargeable with notice of Furry's equity at the time he took the mortgage, and he stands in the place of his grantor. The license has been acted upon, and the parties cannot be restored to their original position." This case was afterwards overruled or restricted in its application to party-walls, on the ground that the remedy, if there be any, should be sought in equity, and not at law. Kamphouse v. Gaffner, supra. But we believe the court was right in saying it would be a fraud to revoke the license in reliance upon which a house had been built, and that, if not at law, at least in equity, there is a remedy for the licensee or his vendee or successors in interest. Cases may arise and have arisen where a license to occupy land has been intended and understood as a mere personal favor to the licensee to give him a place to live, or to occupy for some other beneficial purpose not transmissible, but revocable at will. Then expenditures would naturally be made accordingly. In other cases the granting of the license has been in terms an assurance of permanent possession. It is evident that the same rule cannot apply to both classes of cases. The revocation of the license, even after expenditures made in consequence of it, in the one case is a right, in the other a fraud. No general rule can be made as to the revocability of such licenses after such expenditures. Each case stands upon its own circumstances. The conflict in the authorities has arisen largely from an attempt to make a general rule that all such licenses

are revocable on the one hand, or that they are not revocable on the other, when, if the courts had simply decided the cases, and left out the general rule, they might all have been right, and not in conflict. When we have traveled through the mass of decisions, cloudy and conflicting at times, and have arrived at the principle that equity will relieve where there is fraud, actual or constructive, we have arrived at a principle in regard to which there is no conflict. And courts of equity, as quotations already given show, are very generally agreed that the revocation of a parol license to permanently occupy and improve realty after any considerable expense has been incurred, on the faith of such license, under circumstances such that the parties cannot be placed *in statu quo*, is either actual or constructive fraud. Even the courts of law very extensively recognize the fraud, and some of them remedy it by equitable estoppel; but it seems the majority of them acknowledge their inability to furnish the appropriate remedy, while suggesting frequently that equity may do so.

Verling K. Hart perpetrated no fraud. He treated the settlers on his land by his permission as rightfully there. Juliet W. Hart committed no fraud. She also treated the settlers on the town-site of Buffalo as rightfully there, even to the extent of extending their license to occupy, improve, and hold lots, which expired with Verling K. Hart on February 17, 1883, to the 23d of the following August. A license to hold and enjoy realty may be made as effectual by subsequent ratification as by precedent authority. Her conduct was such as to recognize and acknowledge the rights of the settlers under the license given them by Verling K. Hart, at least to the extent that they were not trespassers, and that their improvements were their own. This was a substantial ratification of their license. Her present attitude of seeking to evade or annul this license, as to complainant, is not voluntarily assumed. It is in a measure forced on her by the complainant's own acts. His conduct is not such as to commend him to the favorable consideration of a court of equity. It cannot be supposed that Verling K. Hart, in assuring the settlers that they should have the land improved by them, could mean more in regard to lots on a business street than one lot to a building, included within the limits of the lot, or sufficient front to clear their build-

Metcalf v. Hart.

ings where more than one lot was built on, and the depth of the lots back. This is a fair understanding of the terms in which he gave permission to occupy and improve lots. If the terms in this respect and one or two others had been more definite, the parol license to occupy would have been converted into a parol contract of sale. All of this was offered complainant for a small price; but, while not objecting to the price, he wanted more ground. We cannot sustain complainant's claim to the ground, or any portion of it; the contract under which he claims being incomplete in the one case, and impossible of performance in the other. And yet to deprive him of his improvements, made, as they evidently were, in good faith, is no less than a fraud upon him.

The proper measure of relief in such cases is a matter in which there is much diversity of opinion. The Pennsylvania courts go to the extent of holding a parol license, executed in whole or in part, at large expense, an agreement on valuable consideration, and hold it irrevocable, and enforce it according to its scope, meaning, and intent. On the other extreme, a few cases can be found refusing any relief whatever. In this regard, as in others, each case must stand upon its own facts and circumstances. Equity has ample power to mould a decree that will accomplish substantial justice. To determine what substantial justice requires we must take into consideration all the facts and circumstances of this particular case. Cases almost without limit can be found announcing in general terms rules apparently applicable, but when the facts of such cases are examined few can be found that are parallel to the case at bar. As already explained, the terms of the license in this instance were too incomplete in several particulars to constitute a contract capable of specific performance in equity. But the terms and the true intent of that license, so far as they can be ascertained, are controlling considerations in determining the equities of the parties. The license by Verling K. Hart was given before any survey or platting of the town,— before the location, size, and shape of blocks and lots had been determined. We have already intimated the view that all that settlers are equitably entitled to under that license, on business streets, is sufficient front to clear their buildings, and the depth of a lot back. This is a liberal construction in favor of the set-

tlers. Fischer's understanding of Hart's inducement to settlers, and which he was authorized to make public as far as the railroad, was that mechanics and good people locating and making improvements on the town-site should have each a lot at small expense,—as he understood it, the expense of recording. The size of town lots had not then been determined. A fair construction of this is that it means, as applied to business streets, the front and depth back already indicated. This is defendant's construction. The written instrument of September 20, 1883, would indicate such intent; but that, being a proposition to settle all controversies, is not conclusive. When complainant was building on lot No. 2, as Wood thinks, but at work on lot No. 1, as he thinks himself, and when Wood was making a preliminary survey for defendant, Wood and complainant had a conversation in regard to the matter. Complainant says that Wood was defendant's agent. Wood says he was not, but states that he platted the town-site, and had been assisting Mrs. Hart, defendant, in making sales and in advertising her business generally. He is her brother-in-law. It would seem from all the evidence that the building which Wood speaks of as about lot 2 actually extends over on lot 3. Wood's recollection of this conversation and complainant's do not agree. It is not very material what the conversation was. It is material, however, that then, or soon after, the erection of the building mentioned was going on, and neither then nor afterwards was it objected to by defendant herself, or by Wood for her, although they both lived within 300 or 400 feet of the place, and defendant as well as Wood must have known of the erection of the building. It is also questionable whether, under the circumstances, plaintiff had not a right to rely on Wood's admitted statement to him that Mrs. Hart would not probably interfere with his building unless in the way of platting the town, and to expect that, if she did object, Wood would ascertain the fact, and inform him of it. This much would seem to come within the scope of Wood's employment, as stated by himself. No intimation ever reached complainant to the effect that it was desired he should not proceed. The circumstances would rather seem to corroborate complainant's understanding that defendant would be glad to have such a building erected. He says, at the

Metcalf v. Hart.

time of its erection it was the best building in town. At any rate, he was not treated as a squatter or a trespasser. But this gave him no right to claim more land than necessary for the reasonable use and enjoyment of the buildings he had erected or was then erecting. This amount of land the language and conduct of Verling K. Hart in his life-time shows that he intended settlers putting up fairly good buildings should have. This amount the language and conduct of defendant shows that she intended settlers to have who erected or commenced such buildings on or before August 23, 1883. The main consideration of this inducement was, doubtless, the location and holding there of the principal town of that portion of the country; and this was a very important and valuable consideration. It probably made a few acres more valuable than the entire desert claim would have been without the town upon it. In addition to this, the settlers were to pay what sometimes was called a nominal price, sometimes a small price, probably intended to cover expense of surveying, platting, recording, conveyancing, etc.

When this cause was tried below no question of rents and profits was in issue. At the time the evidence was taken, the cause argued and submitted, and the opinion of the chancellor filed, indicating what the decree would be, there was positively nothing in the pleadings as to any rental values. The answer concluded with a general charge that complainant had derived great benefit and emolument from the use of said premises, etc.,—a statement too indefinite for a ground of judgment, and on which no judgment was asked. The cross-bill attempted to raise the question. It is proper, and probably necessary, that we now give our views upon that question for the guidance of the court below, as it is likely to be considered in the future progress of the case, and is included in the decree. This seems to be simply and clearly a case where the property of complainant has been incorporated with that of defendant with the consent and permission of defendant and her predecessor in interest, and that the property on both sides was real estate, and that of complainant such as usually becomes part of the inheritance; that this was done under a parol license, now executed at large expense by complainant, which license was in the nature of an agreement for the future sale and conveyance to complainant of the land of defendant upon which complainant's part of the property, consisting of valuable buildings, was placed and erected; that this license, although in the nature of such agreement, and now executed on the part of complainant, is incomplete in some of the material terms necessary to constitute a contract, and cannot be specifically enforced as such; that it was not contemplated, either by licensee or licensors, that any rent, either ground-rent or other rent, should ever be charged against the licensee, but rather that he was considered the equitable owner of the land upon which he erected his buildings, and entitled to the legal title as soon as practicable, at a small charge, probably intended merely to cover incidental expenses. Under these circumstances, while we cannot give complainant the legal title to the land, we do not think it equitable that he should pay rent for it.

The case of King's Heirs v. Thompson, 9 Pet. 204, decided by the supreme court of the United States in 1835, seems to have stood unchallenged as authority up to the present time. It was not exactly similar in all its facts to the case at bar, but seems precisely analogous in most of the legal and equitable principles involved. The case will be found to be in harmony with a number of those already cited, and it is believed in conflict with very few anywhere. It was a bill in chancery, praying for a decree for the legal title of the realty involved, or, if that could not be decreed, that the property might stand charged with the amount of repairs and improvements expended on it. The complainants, Josiah Thompson and Elizabeth, his wife, were married in 1812. A few days after the marriage, George King, Elizabeth Thompson's father, being then in good circumstances, proposed to Josiah Thompson to give him a house and lot, then much out of repair, if he would repair it so as to make it a comfortable residence, stating at the same time that he intended the property for his daughter, complainant's wife. Complainant accepted the property, and expended upon it over $4,000. On April 17, 1816, King wrote to complainant that in order to remove any suspense in regard to the property on which complainant then lived he held himself bound to give a deed to a trustee, who shall hold it in trust for the complainant and wife during their lives, etc. Complainant answered April 26th, declining the proposition and suggested (1) that

the property be valued at the time he received it, and he would pay the amount over to King, etc; (2) that the improvements be estimated, and King, on paying the amount, should receive a relinquishment of all his right; (3) that a deed of the property should be executed to complainant's wife. April 29th King replied: "I make no hesitation in complying with your first proposal, for it is just what I first proposed to you; and I will do it another way, giving you your choice, viz.: I will deed the dwelling-house and all above it to you, and about twenty feet below it; and then all below I will deed to Betsy, [complainant's wife,] provided that she will never deed it or dispose of it except by will, which she shall always be at liberty to make when and how she pleases." Afterwards there was some correspondence in regard to rents of the premises after Thompson left them, King acting as his agent in renting and in collecting and forwarding rents to complainant. There was no conveyance made, and in 1820 King died insolvent. The litigation is between his heirs and creditors on one side and Thompson on the other. The court holds that it is impossible to decree a title as prayed for in the bill, because the "evidence fails to establish the specific terms of the contract; but holds, further, that whatever uncertainty may exist as to the terms of the contract, there can be no question that the complainant acted under it in taking possession of the property and expending a large sum of money in its improvement." And the opinion proceeds: "As the circuit court decreed a conveyance of this property to the complainant, that decree must be reversed and the cause remanded to that court, with instructions to cause the property to be sold, after due notice, on such terms as they shall deem most advantageous to the estate of George King, and the proceeds of the sale first to be applied to the payment of the money expended by the complainant in making improvements on the property, and the balance, if any, to be paid over to the benefit of the creditors of the estate of King." No charge was made against complainant for rents received or for the use of the property while he occupied it, nor allowance made for interest on money expended. The litigation being between the creditors of King, as well as the heirs, on one side, and the party who had made the expenditures on the property on the other, makes

v.3wyo.—20

a stronger case for the recoupment of rents collected, and for a rent charge for the use of the property while Thompson occupied it, than if, as in the case at bar, the litigation were between the original parties or their successors. The true doctrine of such cases is that the party making the improvement cannot be made liable to a rent charge by any notice to quit. He is in possession of his own property, incorporated, it is true, with the property of another, but without fault on his part; and his interests cannot be terminated in that way, either by commencement of suit or anything else that the licensor alone can do. This would be to make the executed license revocable at the will of the licensor, contrary to the prevailing doctrine in equity The duty of the licensee to surrender possession, or to pay rent, which is equivalent, begins when he is paid for his interest, and not before; and this result can be reached only by a mutual agreement of the parties or by a decree of court, and the sole justification for a court of equity in making such a decree exists in the necessity of the case. In no other way can a separation of the interests of the parties be effected without serious injury to at least one of the parties. To remove improvements consisting of permanent and valuable buildings is, in great measure, to destroy their value. In the case at bar such removal was forbidden by the defendant The case of King's Heirs v. Thompson, like the case at bar, lies near the line which separates a license to occupy from a contract of sale. The case of Parkhurst v. Van Cortlandt, supra, lies near the line upon the other—the contract—side. The conveyance promised in the latter case was in the alternative,—a deed of title or a permanent lease, at the option of the licensees. The consideration was not fixed, but the contract or license provided the means of fixing it. It was to be the price of wild lands at the time of the conveyance. If a lease was chosen, the rent was to be the usual rental of similar lands in the vicinity. It may well be doubted if all chancellors would decree specific execution of a contract in these terms. The court was unanimous that the complainants were entitled to equitable relief, but divided on the question whether the relief should be compensation for improvements made or specific performance of the contract. A majority were in favor of specific performance.

The decree of the court below is incon-

Metcalf v. Hart.

sistent in its findings and conclusions. It declares that complainant since June 28, 1884, has been and is now without right tortiously and unlawfully in possession of the property in controversy; but it gives judgment for rents only from September 5, 1885. This is the date of a notice to quit, which was served on him on September 7, 1885. If his possession was tortious, no such notice was necessary to fix his liability for rents. If such notice were necessary, rent should be computed from date of service. There is error in the decree in the following particulars: (1) In embodying in the decree an order in the nature of an interlocutory order allowing a cross-bill tendering new issues to be filed after the cause had been tried, and the substance of the decree determined. (2) In decreeing relief to defendant upon the new matter set up in her cross-bill, in the same decree in which was contained the order allowing the cross-bill to be filed; thus giving complainant no opportunity to answer such cross-bill, or even to say whether he wished to answer it or not. (3) In attempting to adjudicate matters not in issue in the cause; that is to say, in awarding to defendant the possession of the property in controversy, and process to put her in possession, and judgment in her favor for rents. (4) In denying to complainant compensation for improvements put by him upon the land in controversy. (5) In charging complainant rent for the property in controversy, which is error even if rent were in issue. (6) In dismissing complainant's original and amended bills. (7) In refusing to enjoin defendant's two actions of ejectment. For these errors the decree of the district court is reversed, and the cause remanded for further proceedings in accordance with this opinion.

This cause should be retried upon the theory that both complainant and defendant have a valid interest in the realty in controversy, and that complainant's possession of that portion of the ground occupied by his improvements is and has been rightful, and that he is liable for no rent for the same; but that the ground itself belongs to defendant. The value of the property, including the ground so occupied by complainant's improvements, and the improvements, should be ascertained, and the value of the ground and the improvements separately, and a decree should be made allowing complainant the present value of his improvements, and making it a lien upon the property. Then, unless defendant elect to discharge the lien by paying the amount into court for the use of complainant, the property should be sold as on execution, and the proceeds divided between complainant and defendant in the proportion of the value of their respective interests. Defendant having tendered to complainant, before the commencement of the litigation of the interests in controversy, all that he was equitably entitled to, and he having refused the tender, and his conduct in other respects having been arbitrary and reckless of the rights of others, he should pay all costs of this suit and of the two actions of ejectment mentioned in the pleadings herein; and the amount should be made a lien on his interest in the realty involved, and on the money paid into court to his use in lieu thereof, if such payment should be made; and an order of injunction should issue, enjoining defendant's prosecution of her said two actions of ejectment until complainant receives compensation for his improvements, or until the money be paid into court.

MERRELL, J., concurs.

GROESBECK, C. J., (*dissenting.*) While I concur with the majority of the court as to the equities of the case at bar, I dissent from that part of the opinion and judgment which settles the relief to be given to the complainant. The elaborate and learned opinion of my Brother CONAWAY establishes to my mind that the doctrines of license and equitable estoppel must be applied to the determination of this case, and that the complainant is entitled to relief under these well-known equitable doctrines. The rule is clear that, if the owner of an estate stands by and suffers another, who supposes himself to be entitled to certain lands, to go thereon and make improvements and expend money there,— particularly if this is done by the invitation of the owner, under promise of title,— a court of equity will compel such owner, when he afterwards seeks to assert his title, to indemnify the one who made the expenditure, by making pecuniary compensation; and in such case, if the owner resorts to a court of law and brings an action of ejectment, a court of equity, at the suit of the party making the expenditure, will work out the equitable principle by restraining the ejectment suit until compensation is made. 1 Pom. Eq. Jur.

§ 390, and the cases there cited. By a general and public invitation on the part of Col. Hart, extended to those of his class, the complainant occupied the parcels of land, and erected and maintained valuable improvements thereon. By these acts and those of others, contemporary with him, a town was started, and the desert-land claim of Col. Hart became largely enhanced in value. This occupancy and improvement of the complainant was acquiesced in by Col. Hart, his agent, and his successors in title, until September 7, 1885, when formal demand was made by Mrs. Hart upon complainant for the possession of the premises. Prior to that time she had tendered to the complainant a deed to all the parcels of land, in amount 87 feet, upon which he had made lasting and permanent improvements, and this offer was of the same tenor as that made and accepted by others in the same situation as complainant. The price fixed was only $42, and the rate fixed for each lot and portion of a lot actually improved by complainant was the same as that given to the other settlers and occupants under Col. Hart's invitation. It was all that complainant had a right to expect, even under his construction of the general understanding of the early inhabitants and occupants of the town of Buffalo; yet this offer was refused, and the complainant demanded more land. If specific performance had been decreed to him, it is clear from the testimony that complainant would have only obtained the lots and parcels of lots covered by the deeds. Mrs. Hart has therefore acted in good faith, and the evidence discloses that she honestly endeavored to respect every obligation and to redeem every promise made by her deceased husband, although she claimed that such obligation on her part was a moral, rather than a legal, obligation. The complainant does not object as to the price fixed in the deed for the land thereby granted. He is in the position of having forced the defendant into this protracted and expensive litigation. Nay, more, he has boldly attacked the title of his licensor, and that of the successors to the title, by attempting, with others, to have the patent withheld or canceled; thus compelling the outlay of a considerable sum, expended to meet his charges. By assailing the title he has evidently sought to coerce a settlement from the widow and administratrix in his own way and upon his own terms. While this conduct of the complainant may not operate to defeat his right to relief, it does not address itself favorably to a court of conscience. I concur with the majority of the court that he should be mulcted with the costs. Following the reasoning as set forth so ably in the majority opinion, complainant never had any title to the parcels of land claimed by him, and occupied and improved by him, and it cannot be granted to him. His right, then, is solely to be reimbursed for his outlay, to be paid for his improvements. His right to the use and possession of the premises ceased when demand was made upon him for their surrender, and he should not have a farthing for the use and occupation of them since that date. The value of the improvements should be ascertained as at the date of this demand, and interest should be computed thereon to the time of making the computation under the order of the district court. From this amount should be deducted the rents, issues, and profits of the premises since the date of demand, with interest thereon from the time the same were severally paid. The residue should be decreed to be a lien upon the premises, after a reasonable time is given to the defendant to pay the same; and the premises should be sold to satisfy this lien under the direction of the district court. At the time of the taking of the testimony the rents had amounted to more than the value of the improvements, and since that time nearly four years have elapsed. I do not think that this considerable sum should go to the complainant, and that he should be paid the present value of the premises. The computation I have suggested seems to me to be more equitable and just than the one adopted in the majority opinion, and for these reasons I dissent from the judgment and the opinion rendered in this case.

ON REHEARING.

(April 19, 1892.)

CONAWAY, J. Appellee bases her argument in favor of her motion for a rehearing partly upon the ground that the decision of this court gives to appellant relief for which he did not ask. Such is not the fact. All other matters presented in argument on this motion have been sufficiently considered in the opinion delivered in the case. Rehearing denied.

MERRELL, J., concurs.

GROESBECK, C. J. Adhering to the views expressed by me in this case, I think that a rehearing should have been granted, on the ground that the judgment of this court is too broad, and that the relief given to the appellant is not warranted by the evidence. He should not be allowed for the present value of his improvements, but the value thereof from the time of demand for the premises, with legal interest from that date, from the amount of which should be deducted the rents, issues, and profits of the premises from that date.

### ON MOTION TO DISMISS APPEAL.

(May 28, 1892.)

CONAWAY, J. After the argument and decision of this cause, and the denial of a motion for rehearing, a motion to dismiss the appeal is made on the ground that the decree appealed from is not a final decree, and the appeal is therefore premature. The cases cited in support of this motion do not show that such a motion is permissible at this stage of the proceedings. Many well-considered cases hold to the contrary. The decree appealed from was for the surrender of the realty in controversy, and all improvements thereon, to appellee, and for the rents, issues, and profits from September 5, 1885, and directing a reference to the master commissioner to take and report testimony as to the value of each separate piece of property adjudged to be the property of defendant, appellee here, from that time until the making of such report. It is claimed that the decree is not final until this amount is ascertained, and put in the form of a decree. This court finds that the decree as made is erroneous, and must be reversed. The effect of the motion, if sustained, is to send the cause back to the trial court, to enable it to ascertain the amount of rents, issues, and profits, to which no one is entitled. The court will not do a vain thing. Motion denied.

GROESBECK, C. J., and MERRELL, J., concur.